FEDERAL POWER COMMISSION *v.* NEW ENG-
LAND POWER CO. ET AL.

No. 72–1162.  Argued December 3, 1973—Decided March 4, 1974

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in the result, in which BRENNAN, J., joined, *post*, p. 352. BLACKMUN and POWELL, JJ., took no part in the decision of the case.

*Keith A. Jones* argued the cause for petitioner. On the brief were *Solicitor General Bork, Leo A. Forquer,* and *George W. McHenry, Jr.*

*Thomas M. Debevoise* and *Stanley M. Morley* argued the cause for respondents. With *Mr. Debevoise* on the brief for respondent New England Power Co. were *William J. Madden, Jr.,* and *Jerome C. Muys.* With *Mr. Morley* on the brief for respondent Independent Natural Gas Association of America were *Jerome J. McGrath* and *Francis H. Caskin. L. F. Cadenhead* and *Melvin Richter* were on the brief for respondent Tennessee Gas Pipeline Co., a division of Tenneco, Inc.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case, companion to *National Cable Television Assn.* v. *United States, ante,* p. 336, raises another important problem of construction of the provisions of the Independent Offices Appropriation Act, 1952, Tit. 5, 65 Stat. 290, 31 U. S. C. § 483a. The Federal Power Commission established filing fees under the Natural Gas Act and under the Federal Power Act. These filing fees have not been challenged. What was challenged were annual assessments under both Acts, levied in an effort of the agency to recoup some of the remaining costs under the two Acts.

With respect to electric utilities, the Commission determines each year the costs of administering the Federal Power Act. The costs associated with the Commission's efforts to promote the co-ordination and

reliability of nonjurisdictional electric systems are not included. The Commission also deducts from administration costs the costs associated with services rendered to electric systems not subject to the Commission's jurisdiction and the amount received during the year from filing fees. The remaining balance is assessed against jurisdictional utilities [1] in proportion to their wholesale sales and interchange of electricity. In 1971 these companies had gross revenues of some $21 billion and net income of nearly $4 billion. The annual assessment challenged here involved 1973 and for all such electric companies was $5 million or 0.024% of gross revenue and 0.14% of net income.

As respects natural gas companies, the Commission determines each year the costs of administering the natural gas pipeline programs under the Natural Gas Act, 52 Stat. 821, 15 U. S. C. § 717 *et seq.* These costs, after deducting amounts received from filing fees, are assessed against all natural gas companies with annual operating revenues of $1,000,000 or more in proportion to their deliveries of natural gas in interstate commerce. In addition, all natural gas companies required to file an annual report on their total gas supply (18 CFR § 260.7) are assessed one-tenth of a mill for each thousand cubic feet of new reserves of natural gas certificated each year to support the cost of the producer certificate program.

---

[1] Part I of the Federal Power Act covering licenses to hydroelectric companies, see 16 U. S. C. § 797 *et seq.*, is not involved in this litigation, only Parts II, 49 Stat. 847, 16 U. S. C. § 824 *et seq.*, and III, 49 Stat. 854, 16 U. S. C. § 825 *et seq.* Moreover, the "jurisdictional" aspect of a public utility's activities refers, *inter alia,* to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce as contained in § 201 of the Act, 49 Stat. 847, 16 U. S. C. § 824 *et seq.*, the provision that filled the gap created by *Public Utilities Comm'n* v. *Attleboro Steam & Electric Co.,* 273 U. S. 83. See *United States* v. *Public Utilities Comm'n,* 345 U. S. 295.

348

The Commission in its report, 45 F. P. C. 440 and 964, said as respects both electric utilities and natural gas companies that regulations have provided "the foundation for the sound financial condition which public utilities and natural gas companies have achieved." *Id.*, at 445. It mentioned the "industry-wide recognition of the benefits accruing from only one facet of the Commission's activities—the adoption of a uniform accounting system." *Id.*, at 445 n. 5. The Commission, while noting that its regulatory activities were beneficial to consumers, added that its actions

> "have redounded to the benefit of both industries by creating the economic climate for greater usage of the services of the regulated companies which in turn have further strengthened their financial stability and their ability to sell debt and equity securities required for capital additions to meet ever-increasing demands." *Id.*, at 445.

As respects electric utilities it noted that its regime was "system wide and beneficial" to the companies. *Id.*, at 966. As respects natural gas pipelines it listed its activities that were beneficial to them:

> "the issuance of temporary certificates to expedite deliveries, the elimination of indefinite price escalation provisions, and the control over the quality of natural gas to be delivered and the length of the period in which supplies may be delivered where advance payments are made by the pipelines." *Id.*, at 967.

On petitions for review the Court of Appeals set aside that portion of the Commission's order establishing annual charges, 151 U. S. App. D. C. 371, 467 F. 2d 425. The case is here on a petition for certiorari, 411 U. S. 981.

The Act in question, 31 U. S. C. § 483a, authorizes the head of each federal agency to prescribe a "fee, charge, or price" for any "benefit, privilege, . . . license, permit, certificate, registration or similar thing of value . . . provided . . . by [the] Federal agency . . . for any person (including groups, . . . corporations . . .)" which he determines "to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts . . . ."

The Court of Appeals held that whole industries are not in the category of those who may be assessed, the thrust of the Act reaching only specific charges for specific services to specific individuals or companies. We agree with the Court of Appeals.

The report on the Act, H. R. Rep. No. 384, 82d Cong., 1st Sess., 2, states that "[t]he Committee is concerned that the Government is not receiving full return from many of the services which it renders to *special beneficiaries*" (emphasis added). It is true that the Act includes services rendered "to or for any person (including groups . . .)." But if we are to construe the Act to cover only "fees" and not "taxes"—as we held should be done in the *National Cable Television* case, *ante,* p. 336— the "fee" presupposes an application whether by a single company or by a group of companies. The Office of Management and Budget (then known as the Bureau of the Budget) issued a circular in 1959 [2] construing the Act. That circular stated that a reasonable charge "should be made to each *identifiable recipient* for a measurable unit or amount of Government service or property from which he derives a special benefit." [3]

---

[2] Budget Circular No. A–25, Sept. 23, 1959.

[3] The circular goes on to state that the services include agency action which "provides special benefits . . . above and beyond those

(Emphasis added.) The circular also states that no charge should be made for services rendered, "when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public." [4]

which accrue to the public at large . . . . For example, a special benefit will be considered to accrue and a charge should be imposed when a Government-rendered service:

"(a) Enables the beneficiary to obtain more immediate or substantial gains or values (which may or may not be measurable in monetary terms) than those which accrue to the general public (e. g., receiving a patent, crop insurance, or a license to carry on a specific business); or

"(b) Provides business stability or assures public confidence in the business activity of the beneficiary (e. g., certificates of necessity and convenience for airline routes, or safety inspections of craft); or

"(c) Is performed at the request of the recipient and is above and beyond the services regularly received by other members of the same industry or group, or of the general public (e. g., receiving a passport, visa, airman's certificate, or an inspection after regular duty hours)."

[4] Since oral argument we have been advised by the Solicitor General that of all federal agencies "having industry-wide regulatory authority" there are two, other than the Federal Power Commission and the Federal Communications Commission, which impose "annual industry-wide fees analogous" to those in the instant case. The Solicitor General summarizes the actions of the other two federal agencies as follows:

"The fee schedule of the Atomic Energy Commission is set forth at 10 C. F. R. [§§] 170.21 and 170.31 and was last revised on October 29, 1973 (38 Fed. Reg. 30254–30255). Under that schedule, operators of nuclear power reactors are subject to a minimum annual fee of $20,000 and operators of other nuclear facilities are subject to annual fees ranging from $8,500 to $215,000. Holders of materials licenses are assessed annual fees of up to $27,000. The Commission estimates that approximately $7 million will be recovered from these annual fees in fiscal year 1974. The Commission's fee schedule, including annual fees, was first adopted in 1968.

"The Securities and Exchange Commission imposes an annual

We believe that is the proper construction of the Act. Though it greatly narrows the Act from the dimensions urged by the Commission, it keeps it within the boundaries of the "fee" system and away from the domain of "taxes" toward which the Commission's "economic climate" argument would lead. Some of the assessments made by the Commission under its formula would be on companies which had no proceedings before the Commission during the year in question. The "identifiable recipient" of a unit of service from which "he derives a special benefit," to quote the Office of Management and Budget, does not describe members of an industry which have neither asked for nor received the Commission's services during the year in question. A blanket ruling by the Commission, say on accounting practices, may not be the result of an application. But each member of the industry which is required to adopt the new accounting system is an "identifiable recipient" of the service and could be charged a fee, if the new system was indeed beneficial to the members of the industry. There may well be other variations of a like nature which would warrant the fixing of a "fee" for services rendered. But what was done here is not within the scope of the Act. Hence the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE BLACKMUN and MR. JUSTICE POWELL took no part in the decision of this case.

---

fee of $100 on each of the approximately 1100 investment advisers registered with it under the Investment Advisors Act of 1940, 15 U. S. C. [§] 80b–1 et seq. See 17 C. F. R. [§] 275.203–3 (b). This fee was first adopted in 1972."

This statement covers only fees imposed under Tit. 5, 31 U. S. C. § 483a, not those authorized "under more specific grants of statutory authority."

MR. JUSTICE MARSHALL, with whom MR. JUSTICE
BRENNAN joins, concurring in the result in No. 72–1162
and dissenting in No. 72–948, *ante,* p. 336.

These cases present two distinct issues involving inter-
pretation of the Independent Offices Appropriation Act,
1952: first, whether sufficient "work, service, . . . bene-
fit, . . . or similar thing of value or utility" was con-
ferred on the CATV operators or utility companies to
warrant imposition of a fee under the statute; and,
second, whether, if a fee was justifiably imposed, the
amount of the fee was determined in accordance with
a proper interpretation of the statutory standard that
it be "fair and equitable taking into consideration direct
and indirect cost to the Government, value to the
recipient, public policy or interest served, and other
pertinent facts." 31 U. S. C. § 483a.

The Court, however, fails to recognize that these issues
require independent analysis. Instead, permeating the
Court's opinions on both issues is an attempt to draw
metaphysical distinctions between a "fee" and a "tax."
I do not find this approach either helpful or appropriate;
whatever the label, the questions presented in these
cases involve simply whether the charges assessed by the
Commissions were authorized by Congress. The Court's
approach merely beclouds its analysis, producing results
which seem to me inconsistent and affording guidance
to the agencies in setting their fee policies which might
be charitably described as uncertain.

This approach is allegedly based on the need to
construe the statute narrowly to avoid constitutional
difficulties. I do not believe that any serious question
of the constitutionality of the Act would be presented if
Congress had in fact authorized these charges. The
notion that the Constitution narrowly confines the power
of Congress to delegate authority to administrative
agencies, which was briefly in vogue in the 1930's, has

been virtually abandoned by the Court for all practical purposes,[1] at least in the absence of a delegation creating "the danger of overbroad, unauthorized, and arbitrary application of criminal sanctions in an area of [constitutionally] protected freedoms," *United States* v. *Robel,* 389 U. S. 258, 272 (1967) (BRENNAN, J., concurring). This doctrine is surely as moribund as the substantive due process approach of the same era—for which the Court is fond of writing an obituary, *e. g., Ferguson* v. *Skrupa,* 372 U. S. 726 (1963); *North Dakota Pharmacy Board* v. *Snyder's Stores,* 414 U. S. 156 (1973)—if not more so. It is hardly surprising that, until today's de-

---

[1] "Lawyers who try to win cases by arguing that congressional delegations are unconstitutional almost invariably do more harm than good to their clients' interests. Unrealistic verbiage in some of the older judicial opinions should not now be taken seriously. The effective law is in accord with a 1940 statement of the Supreme Court: 'Delegation by Congress has long been recognized as necessary in order that the exertion of legislative power does not become a futility.' [*Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 398 (1940).] Much of the judicial talk about requirement of standards is contrary to the action the Supreme Court takes when delegations are made without standards. The vaguest of standards are held adequate, and various delegations without standards have been upheld. . . .

"In only two cases in all American history have congressional delegations to public authorities been held invalid. Neither delegation was to a regularly constituted administrative agency which followed an established procedure designed to afford the customary safeguards to affected parties. The Panama case [*Panama Refining Co.* v. *Ryan,* 293 U. S. 388 (1935)] was influenced by exceptional executive disorganization and in absence of such a special factor would not be followed today. The Schechter case [*Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935)] involved excessive delegation of the kind that Congress is not likely again to make. . . .

"In absence of palpable abuse or true congressional abdication, the non-delegation doctrine to which the Supreme Court has in the past often paid lip service is without practical force." 1 K. Davis, Administrative Law Treatise § 2.01 (1958) (footnotes omitted).

cision, the Court had not relied upon *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935), almost since the day it was decided.[2]

I have no doubt—and I suspect that a majority of the Court would agree—that Congress could constitutionally authorize the Commissions to impose annual charges of the sort involved here. Surely the congressionally prescribed standards, permitting imposition of fees for work done or service or benefit provided if they are "fair and equitable" taking into account "cost to the Government, value to the recipient, [and] public policy," are sufficiently definite to withstand any conceivable delegation objection. See, *e. g., Yakus* v. *United States,* 321 U. S. 414, 423–427 (1944); *Lichter* v. *United States,* 334 U. S. 742, 783–786 (1948). I therefore see no reason to construe the statute in an artificially narrow way to avoid nonexistent constitutional difficulties.

Even on a neutral reading of the statute and its legislative history, however, I am convinced that Congress did not intend to authorize industrywide annual assessments like those at issue here. The movement in Congress to encourage Government agencies to establish fees to recover some of the costs of providing services to special beneficiaries began in 1950 with a study of the Senate Committee on Expenditures in the Executive Branch which culminated in a report to Congress on "Fees for Special Services." S. Rep. No. 2120, 81st Cong., 2d Sess. (1950). This report concluded that fees should be charged for agency services the benefits of which accrued wholly or primarily to special interests. *Id.,* at 3–4. In particular, the report pointed out that the FCC "renders a tremendous variety of services, a

---

[2] The last time that the Court relied upon *Schechter Poultry* was in *Carter* v. *Carter Coal Co.,* 298 U. S. 238 (1936).

substantial number of which would lend themselves to equitable fees." *Id.,* at 4. The report listed the type of services for which assessment of fees would be appropriate: radio station construction permits, radio station operating licenses and renewals, authorization of assignment or transfer of licenses, radio operator licenses, and certificates of public convenience and necessity. *Id.,* at 11.[3]

On the other hand, the report was careful to point out the limited nature of its recommendations. It emphasized that it was not proposing that Government regulation in general be made self-sustaining by shifting the costs to those regulated:

> "There has been no quarrel with the philosophy governing the study that those who receive the benefit of services rendered by the Government especially for them should pay the costs thereof. In the several staff reports and press releases which have been issued, occasion has been taken to reiterate that philosophy and to give reassurance that there is no thought here to establish a system of fees for fundamental Government services, but only to explore the feasibility and fairness of shifting to special beneficiaries the expense now being borne for them by the taxpayers at large." *Id.,* at 3.

These themes were reiterated during the 1951 hearings which led directly to enactment of the Independent Offices Appropriation Act, 1952. Hearings on Independent Offices Appropriations for 1952 before the Subcommittee on Independent Offices of the House Committee on Appropriations, 82d Cong., 1st Sess. (1951). The questions of the committee members reflected their

---

[3] Similarly, as to the Federal Power Commission, the report suggested that fees could be charged for issuance of licenses and certificates of public convenience. *Id.,* at 12.

concern that the regulatory agencies were not recouping any part of the cost of services which benefited particular special interests. But it is apparent that the Committee had in mind imposition of fees for issuance of licenses, *id.*, at 281, 681, certificates of public convenience and necessity, *id.*, at 281, 524, and the like. And it was recognized that in the absence of this sort of special benefit, imposition of the cost of regulation on those regulated represented a different philosophical approach, as to which there had been in the past substantial resistance. *Id.*, at 730.

The actual language of the Appropriation Act is quite general, and is certainly capable of varying interpretations. But the intended content of the statute's authorization of fees to be charged for "any work, service publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certificate, registration or similar thing of value or utility" can be gleaned from this legislative history. When the Committee Report expressed its concern that "the Government is not receiving full return from many of the services which it renders to special beneficiaries," H. R. Rep. No. 384, 82d Cong., 1st Sess., 2 (1951), and suggested that "fees could be charged for other services" "of the type here under consideration," *id.*, at 3, I think that it contemplated imposition of application fees, registration fees, and fees for grants of licenses, permits, or other similar authorizations. This interpretation is consistent with the statutory language, with its long enumeration of specific, readily identifiable, and discrete Commission actions for which fees can be charged. This interpretation is consistent, also, with the explanation of the statute on the floor of the House offered by Representative Yates, in which he cited the award of franchises, licenses, certificates of public convenience and necessity, and construction permits as

examples of benefits for which fees could appropriately be charged by the FCC. 97 Cong. Rec. 4809 (1951).

I see nothing in the legislative history which suggests any broader interpretation of the concept of "benefit" under the Act. On the contrary, since the broader view that the full cost of regulation should be assessed those subject to the agency's jurisdiction in the absence of a "special benefit" would have represented a controversial policy choice, I think that the very lack of debate over this provision of the Act and the ease with which it passed compel the more limited interpretation. The Committee Report itself noted that more "basic" changes in agency fee practice would have to await further study by congressional committees and additional legislation. H. R. Rep. No. 384, 82d Cong., 1st Sess., 2–3 (1951).

I therefore do not believe that the creation of an "economic climate" which fosters the growth of a regulated industry is a sufficiently specific, discrete benefit within the meaning of the Appropriation Act to justify imposition of a fee. Nor do I think that this benefit is conferred upon a sufficiently identifiable recipient to be the basis for assessment of a fee. Accordingly, I agree with the Court's construction of the Act, *ante,* at 349–350, and concur in the result in this case.

I cannot agree, however, with the result in No. 72–948, *National Cable Television Assn.* v. *United States, ante,* p. 336. In view of the Court's conclusion in No. 72–1162, I am mystified as to how the Court can reach its apparent, though completely unexplained, holding in No. 72–948 that operators of CATV systems may receive "special benefits" sufficient to sustain imposition of an annual fee under the Appropriation Act. *Ante,* at 343. In 1970, when the fees at issue here were established, FCC regulation of CATV was quite limited. CATV operators did not receive licenses or any similar authorization from the Commission.

Rather, their franchises were generally awarded by state authorities, to whom the CATV operators pay franchise fees. Although FCC regulations prohibited carriage of distant signals into larger television markets unless Commission authorization was obtained, 47 CFR § 74.1107 (1968),[4] carriage of local signals as well as distant signals into smaller markets was permitted, unless objections were raised, without the need for approval by the Commission. 47 CFR §§ 74.1105 (a), (c) (1968). Many of the CATV operators against whom these annual charges were assessed had no contact at all with the Commission during 1970, and some had never had any dealings with the Commission. The only other FCC regulations of CATV in 1970 pointed to by the Solicitor General are regulations which prohibit telephone companies and television broadcasters from entering the CATV field.[5]

In my view, the mere existence of such regulation cannot justify the annual fees imposed in this case. While these regulations may have been of some benefit to the CATV industry in a very broad sense, I regard the FCC's argument on this point as identical to the FPC's

---

[4] It would seem clear that fees could appropriately be imposed under the Appropriation Act in connection with application for or issuance of such Commission authorization. However, no such fees are at issue in this case.

[5] Extensive new regulations of CATV were promulgated in 1972. 37 Fed. Reg. 3280 (Feb. 12, 1972). These regulations prescribe in considerable detail the provisions of franchises granted by local authorities to CATV operators, and also limit the franchise fees which may be charged by the localities in which CATV stations operate. Most important for present purposes, the new regulations also provide that a CATV operator must obtain an FCC certificate of compliance before commencing operations; existing cable systems must obtain a certificate of compliance by March 31, 1977. 47 CFR § 76.11 (b) (1973). While these new regulations will undoubtedly affect the question of the permissibility of fees imposed for future years, they cannot retroactively validate fees imposed for 1970.

"economic climate" argument rejected by the Court in No. 72–1162. I can see no specific benefit provided or service rendered by the Commission on the order of the grant of a license or certificate, processing of an application, or even provision of a new and useful accounting system. Nor do I believe that the benefits of FCC regulation have been conferred on any identifiable recipient; I would think this a classic case where " 'the identification of the ultimate beneficiary is obscure and the services can be primarily considered as benefitting broadly the general public.' " *Ante,* at 350.

I would therefore hold that the annual fees imposed in both these cases were not authorized by the statute. But since the Court apparently holds otherwise, and goes on to discuss the standards to be applied by the FCC in setting fees under the statute, I think it appropriate to express my views on this issue. I cannot agree with the Court that the only factor which the Commission may consider in determining the amount of the fees is the "value to the recipient." The statute provides that the fee must be "fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts." This is a perfectly clear and intelligible standard, and I see no reason why, assuming a proper occasion for imposition of a fee, the Commission is not entitled to weigh each of the statutory considerations. It may well be true that the Commission here gave undue emphasis to one of the statutory factors, "cost to the Government." But the Court's response, to require that undue, seemingly exclusive reliance be placed on the standard of "value to the recipient" is, in my opinion, equally erroneous. It is also quite unrealistic and unworkable: How is the Commission to determine whether to set the fee at 1%, 5%, or 50% of the "value to the

recipient" unless it is also free to consider such other factors as "cost to the Government" and "public policy"?

I would leave the Commission free to consider all the statutory standards in setting its fees. Certainly the Commission should be free to consider "cost to the Government," [6] as well as the statutory mandate that the Commission "be self-sustaining to the full extent possible." It could not be clearer, from the language of the statute and from its genesis, that Congress intended these factors to be considered by the Commissions in setting their fee schedules. If the Court seriously believes that this somehow presents a substantial constitutional problem, then the constitutional issue should be squarely faced and resolved; it should not be permitted to justify the Court's rewriting of the statute contrary to congressional intent.

I would affirm the judgment of the Court of Appeals in No. 72–1162 and reverse the judgment in No. 72–948.

---

[6] In my view, "cost to the Government" comprehends the cost of FCC regulation of the industry as well as the cost of processing a specific application. While the existence of such regulation is not itself sufficient under the present statute to sustain imposition of a fee, it will often be beneficial to the industry—as the Government's "economic climate" argument suggests—and will play a role in enhancing the "value to the recipient" of the license or other authorization. It is therefore neither unreasonable nor inconsistent with the statutory intent that the contribution of this regulation be considered.