601 F.2d 223
 13 ERC 1569, 51 A.L.R.Fed. 571, 9
Envtl. L. Rep. 20,655
 MISSISSIPPI POWER & LIGHT CO., Offshore Power Systems, and
Florida Power & Light Co., Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents.
NUCLEAR ENGINEERING CO., INC., Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents.
CHEM-NUCLEAR SYSTEMS, INC., a Washington corporation, Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents.
 Nos. 78-1565, 78-1871 and 78-2200.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 24, 1979.
 
 Conner, Moore & Corber, Troy B. Conner, Jr., Harold D. Rhynedance, Jr., Washington, D. C., for petitioners in 78-1565 and 78-1871.
 Wise, Carter, Child, Caraway, Sherwood W. Wise, Jackson, Miss., for petitioners in 78-1565.
 Troy B. Conner, Jr., Washington, D. C., for Ark. Power & Light Co., et al.
 Mark J. Wetterhahn, Keith H. Ellis, Washington, D. C., for petitioners in 78-1565 and 78-1871 and for Ark. Power & Light Co., et al.
 Stephen F. Eilperin, Irwin B. Rothschild, III, E. Leo Slaggie, U.S. Nuclear Regulatory Comm., Washington, D. C., for respondents in 78-1565 and 78-2200.
 Neil T. Proto, Dept. of Justice, Washington, D. C., for respondents in 78-1565 and 78-1871.
 Larry G. Gutterridge, Dept. of Justice, Washington, D. C., for respondents in 78-1565.
 R. Lee Armbruster, Louisville, Ky., for petitioner in 78-1871.
 Jones, Grey & Bayley, John L. West, Rudy A. Englund, Seattle, Wash., for petitioner in 78-2200.
 Petitions for Review of an Order of the Nuclear Regulatory Commission.
 Before GEWIN, HILL and FAY Circuit Judges.
 JAMES C. HILL, Circuit Judge.
 
 
 1
 Appellants seek review of a licensing fee schedule adopted by the Nuclear Regulatory Commission (NRC) on February 9, 1978. In reviewing the fee schedule we must decide whether the charges assessed by the agency may properly be classified as "fees," or branded as unconstitutional "taxes." After careful examination of the assessments levied by the agency, we conclude that the fee schedule should be upheld.
 
 I.
 
 2
 On August 10, 1973, the Atomic Energy Commission (AEC), the predecessor of the NRC, adopted a fee schedule designed to recover the costs for processing applications, permits and licenses as well as the costs arising from health and safety inspections and statutorily mandated environmental and antitrust reviews.
 
 
 3
 On March 4, 1974, the Supreme Court decided two cases in which fees charged by the Federal Communications Commission (FCC) and the Federal Power Commission (FPC) were successfully challenged. National Cable Television Association, Inc. v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); Federal Power Commission v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). In these two decisions, the Court for the first time construed Title V of the Independent Offices Appropriation Act (IOAA), 31 U.S.C.A. § 483a,[1] the statutory provision permitting federal agencies to charge fees. The court construed the Act to allow fees only for special benefits rendered to identifiable recipients; these fees were to be measured by the "value to the recipient" of the agency service.
 
 
 4
 In response to these two decisions, a petition for rulemaking was filed on May 2, 1974, by the petitioners herein and others, requesting the Commission to amend its 1973 fee schedule to comply with the Supreme Court decisions. The petitioners suggested that the Commission could not recover more than five percent of its licensing costs because at least 95 percent of the regulatory costs of the Commission's licensing activities benefited the public rather than the applicant.
 
 
 5
 On November 11, 1974, the AEC published for comment proposed revisions to the fee schedule that differed from the petitioner's recommended schedule. While the Commission was considering the comments on the proposed schedule, the Court of Appeals for the District of Columbia handed down four opinions on December 16, 1976, invalidating portions of the license fee schedule promulgated by the Federal Communications Commission.[2]
 
 
 6
 Using these decisions to provide additional guidance, the Commission on May 2, 1977, issued a new proposed notice of rulemaking. After receiving public comments, the Commission revised the rule to incorporate these comments and published a final rule on February 21, 1978.
 
 
 7
 Using the two Supreme Court decisions and the four opinions issued by the District of Columbia Circuit as a framework for analysis, the NRC devised a set of guidelines from which to structure the fee schedule.[3] Based on these guidelines, the NRC analyzed the functions performed and services rendered by each NRC office to determine which activities, if any, provided special benefits to applicants, licensees or permittees. After determining which of these services constituted special benefits, the NRC calculated the cost of providing this service, a cost which included professional manpower costs, overhead support and contractual services costs.[4] Under the fee schedule adopted by the Commission, approximately eighty percent of the Commission's budgeted regulatory costs in Fiscal Year 1977 were excluded from consideration for recovery. These excluded costs include agency activities which, in the Commission's view, either do not provide special benefits to identifiable recipients, or represent agency programs providing an independent public benefit, such as rulemaking proceedings. Under this revised schedule, the NRC estimated that it would recover approximately $30 million of its Fiscal Year 1978 budget and approximately $20 million of its Fiscal Year 1979 budget.
 
 II.
 
 8
 The petitioners' first argument is a blunderbuss shot aimed at the entire fee schedule itself. Reduced to its simplest form, the petitioners' argument is that the NRC is without authority to assess Any fee against an applicant, since all of the Commission's activities are "in the public interest"; therefore, any charge assessed must necessarily be a "tax" and not a "fee." This proposition is grounded upon the petitioners' interpretation of National Cable Television Association, Inc. v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) (National Cable) and Federal Power Commission v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 1974) (New England Power). Because these two decisions constitute the starting point for any analysis in this area, we review them briefly.
 
 
 9
 In National Cable, the Court dealt with a challenge to the fee schedule established by the Federal Communications Commission. The FCC had sought to recoup its entire cost of regulating cable television systems by imposing a fee on regulatees, calculated on the basis of the number of subscribers to a particular cable system. In striking down the FCC's fee schedule, the Court narrowly construed Title V of the Independent Offices Appropriation Act (IOAA), 31 U.S.C.A. § 483a.[5] Title V of the IOAA permits federal agencies to charge persons for work or services provided to them. Broadly construed, the IOAA could have been interpreted to permit federal agencies to recoup their entire cost of regulating, a result which would offend the constitutional mandate that only Congress has the "Power to levy and collect Taxes." To avoid such constitutional problems, Justice Douglas construed the IOAA to permit federal agencies to charge fees but not to levy taxes. The Court then carefully proceeded to characterize a "fee." First, a fee "is incident to a voluntary act, E. g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station." 415 U.S. at 340, 94 S.Ct. at 1149. Second, a fee represents a charge for services which bestow a benefit on an applicant not shared by other members of society. Thus, an agency may not charge for protective services rendered to the general public. The statutory phrase "value to the recipient" was found by the Court to be the measure of the authorized fee.
 
 
 10
 In New England Power the Court dealt with a simple challenge to the fee schedule of the FPC in which the Commission attempted to recoup the entire cost of administering the Natural Gas and Federal Power Acts by assessing fees based on the amount of electricity or natural gas sold by a regulated utility company in interstate commerce. In striking down the FPC's fee schedule the Court again emphasized that a "fee" usually presupposes an application by a person or company for a service; thus the Court summarily rejected the Commission's position that general benefits redounding to regulated industries justify the imposition of fees against whole industries. Indeed, the IOAA was interpreted to allow only specific charges for specific services rendered to identifiable recipients. The Court quoted approvingly from a Bureau of the Budget Circular,[6] holding that "no charge should be made for services rendered, 'when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public.' " 415 U.S. at 350, 94 S.Ct. at 1154.
 
 
 11
 The petitioners' contention is that the work of the NRC benefits the general public solely and that the conferral of a license or permit does not bestow upon them any special benefit whatsoever; therefore, they argue, the NRC is without authority to assess Any fee. In this connection we are reminded that "public safety is the first, last, and a permanent consideration in any decision on the issuance of a construction permit or a license to operate a nuclear facility." Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, 367 U.S. 396, 402, 81 S.Ct. 1529, 1532, 6 L.Ed.2d 924 (1961).
 
 
 12
 We reject such an argument because it ignores the realities of the operation of the nuclear power industry and is inconsistent with the interpretation given the IOAA by the Supreme Court. In National Cable the Court recognized the authority of the FCC to assess a fee even though "the main function of the Commission is to safeguard the public interest." 415 U.S. at 341, 94 S.Ct. at 1149. The Court thus acknowledged the FCC's authority to assess against applicants a fee for services rendered notwithstanding the strong public interest served in providing the service; what the Court found objectionable in the FCC's fee schedule was the agency's attempt to recover the entire cost of regulating. There is no contention that the NRC has attempted to do this with its present schedule.
 
 
 13
 The Petitioners contend that National Cable is distinguishable in that the FCC provides a true benefit to licensees, while the NRC's grant of a license confers no benefit upon an applicant. Because of the limited number of broadcast frequencies, a licensee of the FCC receives a valuable privilege and is protected against interference from competing stations;[7] a licensee of the NRC receives no such benefit, it is urged, since anyone with sufficient capital and initiative can construct and operate a nuclear reactor, fuel reprocessing plant or waste disposal facility. This kind of argument has been previously rejected, See National Cable Television Association, Inc. v. F.C.C., 180 U.S.App.D.C. 235, 554 F.2d 1094 (1976). In answering the argument put forth by cable television operators that they receive no benefit from an FCC license because the cable television industry would have developed better without FCC regulation, the District of Columbia Circuit had this to say: "All that may be true, but these distinctions have no relevance here. The fact is that the FCC has undertaken to regulate this industry and has so far been sustained by the Supreme Court in this endeavor, with the result that a certificate of compliance Has become a necessary and therefore valuable license." 180 U.S.App.D.C. at 242-43, 554 F.2d at 1101-02. So too, here. A license from the NRC is an absolute prerequisite to operating a nuclear facility, and as such, is a benefit "not shared by other members of society."[8] Aside from the benefit of being able to operate a business, however, the petitioners are recipients of other benefits flowing from the grant of a license or permit. One such benefit is the limitation on liability afforded by the Price-Anderson Act, 42 U.S.C.A. § 2210, a boon which almost all licensees are entitled to receive.[9] Moreover, we feel quite certain that the routine inspections conducted by the NRC could uncover hazardous conditions which, if allowed to continue, would jeopardize the safe operation of a licensee's facility. In short, we are not impressed by the petitioners' argument that they receive no benefit from the conferral of an NRC license. Even so, to accept petitioners' argument would mean that No federal agency could assess any fees, since all public agencies are constituted in the public interest. We therefore hold that the NRC has full authority to assess fees against applicants. Whether the Commission has properly assessed those fees is an entirely different matter, one to which we now turn.
 
 III.
 
 14
 Having failed to shoot down the entire fee schedule, the petitioners next take a more precise aim, hoping to invalidate selected portions of the schedule. As an alternative argument, the petitioners concede that the Commission may assess fees, but nonetheless assert that certain fees contained in the schedule are improper. Specifically, the petitioners insist that some public benefit inheres in every service provided by the NRC, and that the agency should exclude from its fees that portion of the agency service which represents the benefit inhering to the public. This proposed allocation requirement is the basis for most of the petitioner's objections to specific items included in the fee schedule.
 
 
 15
 The Commission, of course, does not agree. It takes the position that it is not required to segregate public and private benefits and that it may recover the Full cost of providing a service to a private beneficiary, regardless of whether that service may also benefit the public. We agree with the Commission.
 
 
 16
 Our position is consistent with the view of the IOAA taken by the Supreme Court in New England Power. There, the Court cited with approval a 1959 Bureau of the Budget Circular[10] which the Court felt represented a proper construction of the IOAA. In interpreting the Act, the Bureau opined: "Where a service (or privilege) provides special benefits to an identifiable recipient above and beyond those which accrue to the public at large, a charge should be imposed To recover the full cost to the Federal Government of rendering that service." (J. App. 130) (emphasis added). It is true, as the petitioners point out, that the Court in National Cable criticized the FCC for assessing fees based upon a formula contrived to reimburse the Commission for its total cost of supervision. But here, the NRC does not attempt to recoup all of its regulatory costs;[11] it seeks only to recover the total cost of providing services to private beneficiaries.
 
 
 17
 The District of Columbia Circuit has also rejected the suggestion of an allocation requirement. In Electronic Industries Association v. F.C.C., 180 U.S.App.D.C. 250, 554 F.2d 1109 (1976), the Court found that the FCC was not prohibited from charging an applicant for the Full cost of rendering services to him, even though some incidental public benefit might flow from the service provided.[12]
 
 
 18
 In addition to being supported by persuasive if not controlling precedent, this approach comports with the clear legislative intent that agency services be "self-sustaining to the full extent possible." 31 U.S.C.A. § 483a. To impose the petitioners' allocation requirement would saddle agencies with the impossible task of sorting out public from private benefits, with the likely result that most agency fees would be reduced to mere tokens. In conclusion, we hold that the NRC may recover the Full cost of providing a service to an identifiable beneficiary, regardless of the incidental public benefits flowing from the provision of that service.
 
 
 19
 Having cast aside the allocation requirement, we now examine the propriety of the specific fees assessed by the Commission. Before doing so, however, we wish to summarize the characteristics of those items properly assessed as fees. First, no fee may be charged to a private party when there is no identifiable beneficiary, i. e., "when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public."[13] Second, the fee assessed cannot exceed the cost to the agency of rendering the service. Electronic Industries Association v. F.C.C., 180 U.S.App.D.C. 250, 255, 554 F.2d 1109, 1114 (1976). Finally, expenses incurred to serve some "Independent public interest" cannot be included in the fee, although, as we have already concluded, the agency may recover the full cost of rendering a service to a private beneficiary. 180 U.S.App.D.C. at 256, 554 F.2d at 1115.
 
 
 20
 The petitioners first challenge the charges assessed by the NRC for routine inspections, arguing that such inspections constitute protective services rendered for the benefit of the general public. Although we are certain that the public benefits from routine inspections which protect the health and safety of the general populace, these inspections are nonetheless needed to assure a licensee's compliance with the Atomic Energy Act and with Commission regulations necessary for retention of the license.[14] An applicant before the NRC must meet certain requirements as a prerequisite to obtaining a license; likewise, a licensee must comply with certain statutory and regulatory requirements in order to maintain his license. By complying with these requirements, an applicant is able to obtain and keep his license; as we have previously discussed, the receipt and retention of the license is of unquestionable benefit to the applicant. In conducting routine inspections, the Commission provides a service to the licensee by assisting him in complying with those statutory and regulatory requirements necessary for retention of his license. Electronic Industries Association v. F.C.C., 180 U.S.App.D.C. 250, 256, 554 F.2d 1109, 1115 (1976). We hold that the Commission may properly assess a fee for the cost of providing this service.
 
 
 21
 Next, the petitioners question the authority of the NRC to charge for the costs incurred in conducting environmental reviews required by the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.A. § 4321. We uphold the Commission's authority to charge a fee for such reviews because they are a prerequisite to the issuance of a license.[15] It matters not that the legal obligation of preparing environmental impact statements rests with the NRC; nor is the Commission's authority to assess such fees undercut by the obvious public benefit flowing from the preparation of these environmental reviews. The Commission must conduct these reviews before it can issue a license to an applicant; it is a necessary part of the cost of providing a special benefit to the licensee. In other words, it is "incident to a voluntary act."[16] Because the Commission may recoup the Full cost of conferring a special benefit, it may recover its costs for conducting environmental reviews.[17]
 
 
 22
 The petitioners also object to the inclusion in the fee schedule of the costs of uncontested hearings. We believe this charge is proper. Section 189(a) of the Atomic Energy Act, 42 U.S.C.A. § 2239(a), requires the Commission to hold a public hearing before it may issue a construction permit for a nuclear reactor. Uncontested hearings are those in which there is no controversy between the NRC staff and the applicant and no intervention has taken place. See 10 C.F.R. § 2.4(n) (1978). These hearings are an integral part of the process of approving an applicant's license and are required by the Atomic Energy Act itself. Because these costs are necessarily incurred by the agency in providing a service to the applicant, they should be assessed against the applicant.[18] Electronic Industries Association v. F.C.C.,180 U.S.App.D.C. 250, 258 n. 17, 554 F.2d 1109, 1117 n. 17 (1976).
 
 
 23
 We cannot agree with the petitioners that expenses of the trial staff in uncontested hearings should be excluded from recovery because the trial staff represents an independent public interest. See Electronic Industries Association v. F.C.C., 180 U.S.App.D.C. 250, 554 F.2d 1109 (1976). Unlike a contested proceeding, the presiding officer in an uncontested hearing simply reviews, without conducting a De novo review of the application, the NRC staff's prior conclusion that the applicant has complied with the terms of the Atomic Energy Act and is entitled to receive a license. 10 C.F.R. § 2.501(2) (1978). This review is in the nature of an internal check by the agency that the applicant has complied with the statute, and does not serve an independent public interest.[19]
 
 
 24
 The petitioners further object to being charged for administrative and technical support costs. The Commission's position is that these costs must be included in the fee schedule because they constitute part of the total cost of providing a service; the petitioners contend that such costs should be excluded because they represent general agency expenses which do not benefit an "identifiable recipient."
 
 
 25
 The cost of performing a service, such as granting a license to construct a nuclear reactor, involves a greater cost to the agency than merely the salary of the professional employee who reviews the application. The individual must be supplied working space, heating, lighting, telephone service and secretarial support. Arrangements must be made so that he is hired, paid on a regular basis and provided specialized training courses. These and other costs such as depreciation and interest on plant and capital equipment are all necessarily incurred in the process of reviewing an application. Without these supporting services, professional employees could not perform the services requested by applicants.
 
 
 26
 Such costs may be assessed against an applicant as part of the total cost of processing and approving a license; we emphasize again that the Commission may recover the Full cost of providing a service to a beneficiary. Indeed, the IOAA itself urges federal agencies to assess fees taking into consideration both the "direct and indirect cost to the Government." 31 U.S.C.A. § 483a. Here, the Commission has carefully and thoroughly explained its method of calculating these administrative and technical support costs.[20] We find the Commission's formula to be a reasonable method of estimating such fees. Notwithstanding the petitioners' assertions to the contrary, the NRC in estimating its costs is only obligated to come forth with reasonable approximations, not precise calculations. National Association of Broadcasters v. F.C.C., 180 U.S.App.D.C. 259, 271 n. 28, 554 F.2d 1118, 1130 n. 28 (1976).
 
 
 27
 Finally, the petitioners attack the Commission's assessment of a fee for renewing a license to operate a low-level radioactive waste burial site. First, it is argued that the Commission acted arbitrarily when, in assessing its fees, it failed to distinguish between those licensees operating in "agreement" versus "non-agreement" states. An agreement state is one which has entered into an effective agreement with the NRC under Section 274(b) of the Atomic Energy Act, 42 U.S.C.A. § 2021(b), which authorizes the state to license specified radioactive materials. The agreement state licenses all radioactive wastes except the special nuclear material over which the Commission must retain exclusive jurisdiction because of the quantity of the material involved. For companies operating waste disposal sites in an agreement state, then, a license must be obtained from both the state and the NRC. The petitioners contend that the NRC should reduce its fee for license renewal for those companies operating sites in agreement states because those states handle the bulk of the regulatory responsibilities with respect to radioactive waste disposal. We reject the petitioners' contention that dual regulatory responsibilities should have any impact upon fee assessment. Whether the state or the Commission bears the burden of regulating is not relevant, since the cost of regulation cannot be recovered under the Commission's fee schedule. A company operating a waste disposal site in an agreement state must of necessity obtain a license from the NRC, and the Commission is entitled to recover the full cost of conferring that benefit. Federal Power Commission v. New England Power Co., 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974); Electronic Industries Association v. F.C.C., 180 U.S.App.D.C. 250, 554 F.2d 1109 (1976).
 
 
 28
 Second, the petitioners contend that the renewal fee set by the Commission is unsupported in the record and is unreasonably high. We cannot agree. We find the Commission's figures to be a good faith estimate of the costs of renewing a waste disposal license. To the extent that the fee exceeds the actual costs of renewal, the Commission will refund the difference to the licensee.[21] Certainly we cannot say that the Commission's fees are arbitrary or capricious. Thus, the fee charged for the renewal of waste disposal licenses is proper.
 
 IV.
 
 29
 In summary, we hold that the Commission has the authority to recover the Full cost of providing services to identifiable beneficiaries. We uphold the fee promulgated by the Commission as being consistent with this principle. We have examined the remaining contentions of the petitioners and find them to be without merit.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 § 483a. Services as self-sustaining; uniformity; regulations; deposit in Treasury; effect on other laws
 It is the sense of the Congress that any work, service, publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certificate, registration, or similar thing of value or utility performed, furnished, provided, granted, prepared, or issued by any Federal agency (including wholly owned Government corporations as defined in the Government Corporation Control Act of 1945) to or for any person (including groups, associations, organizations, partnerships, corporations, or businesses), except those engaged in the transaction of official business of the Government, shall be self-sustaining to the full extent possible, and the head of each Federal agency is authorized by regulation (which, in the case of agencies in the executive branch, shall be as uniform as practicable and subject to such policies as the President may prescribe) to prescribe therefor such fee, charge, or price, if any, as he shall determine, in case none exists, or redetermine, in case of an existing one, to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts, and any amount so determined or redetermined shall be collected and paid into the Treasury as miscellaneous receipts: Provided, That nothing contained in this section shall repeal or modify existing statutes prohibiting the collection, fixing the amount, or directing the disposition of any fee, charge or price; Provided further, That nothing contained in this section shall repeal or modify existing statutes prescribing bases for calculating of any fee, charge or price, but this proviso shall not restrict the redetermination or recalculation in accordance with the prescribed bases of the amount of such fee, charge or price.
 
 
 [2]
 National Cable Television Association, Inc. v. F.C.C., 180 U.S.App.D.C. 235, 554 F.2d 1094 (1976); National Association of Broadcasters v. F.C.C., 180 U.S.App.D.C. 259, 554 F.2d 1118 (1976); Electronic Industries Association v. F.C.C., 180 U.S.App.D.C. 250, 544 F.2d 1109 (1976); Capital Cities Communications, Inc. v. F.C.C., 180 U.S.App.D.C. 276, 554 F.2d 1135 (1976)
 
 
 [3]
 These guidelines were developed by the NRC:
 
 
 [1]
 Fees may be assessed to persons who are identifiable recipients of 'special benefits' conferred by specifically identified activities of the NRC. The term 'specific benefits' includes services rendered at the request of a recipient and all services necessary for the issuance of a required permit, license, approval, or amendment, or other services necessary to assist a recipient in complying with statutory obligations or obligations under the Commission's regulations;
 
 
 [2]
 All direct and indirect costs incurred by the NRC in providing special benefits may be recovered by fees;
 
 
 [3]
 It is not necessary to allocate costs in proportion to the degree of public or private benefit resulting from conferring a special benefit on a recipient;
 
 
 [4]
 Where the identification of the specific beneficiary of NRC activity is obscure, the cost of the activity may not be included in the cost basis for fees;
 
 
 [5]
 A fee shall not exceed the sum on the average of the direct and indirect costs which the NRC incurs in furnishing the services for a member of the class of recipients for which the fee is assessed; and
 
 
 [6]
 Calculation of agency costs shall be performed as accurately as is reasonable and practical, and shall be based on specific expenses identified to the smallest practical unit associated with the rendering of the type of agency service to the particular class of recipients
 
 
 [4]
 A full description of how these fees were devised is contained in the final rule itself. 43 Fed.Reg. 7210-7217
 
 
 [5]
 See note 1, Supra
 
 
 [6]
 Budget Circular No. A-25 (J. App. 129-34) was issued on September 23, 1959. The circular provides in part:
 
 
 [3]
 General policy. A reasonable charge, as described below, should be made to each identifiable recipient for a measurable unit or amount of Government service or property from which he derives a special benefit
 a. Special services.
 (1) Where a service (or privilege) provides special benefits to an identifiable recipient above and beyond those which accrue to the public at large, a charge should be imposed to recover the full cost to the Federal Government of rendering that service. For example a special benefit will be considered to accrue and a charge should be imposed when a Government-rendered service:
 (a) Enables the beneficiary to obtain more immediate or substantial gains or values (which may or may not be measureable in monetary terms) than those which accrue to the general public (e. g., receiving a patent, crop insurance, or a license to carry on a specific business); or
 (b) Provides business stability or assures public confidence in the business activity of the beneficiary (e. g., certificates of necessity and convenience for airline routes, or safety inspections of craft); or
 (c) Is performed at the request of the recipient and is above and beyond the services regularly received by other members of the same industry or group, or of the general public (e. g., receiving a passport, visa, airman's certificate, or an inspection after regular duty hours).
 (2) No charge should be made for services when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public (e. g., licensing of new biological products).
 
 
 [7]
 In Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973), the Court said:
 Unlike other media, broadcasting is subject to an inherent physical limitation. Broadcast frequencies are a scarce resource; they must be portioned out among applicants. All who possess the financial resources and the desire to communicate by television or radio cannot be satisfactorily accommodated.
 
 
 [8]
 We have no doubt that this was the result intended by the Congress and approved by the Supreme Court in National Cable and New England Power. As the Supreme Court said in National Cable : "A fee, however, is incident to a voluntary act, E. g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society." 415 U.S. at 341, 94 S.Ct. at 1149
 
 
 [9]
 The protections of the Price-Anderson Act are fully explained in Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). We are aware that a licensee must pay for financial protection up to the liability ceiling, but the limitation on liability is nonetheless an important benefit accruing to the licensee
 
 
 [10]
 Other relevant portions of the Circular are set forth in note 6, Supra
 
 
 [11]
 As we have mentioned before, at least eighty percent of the Commission's budgeted regulatory costs for Fiscal Year 1977 were excluded from consideration for recovery
 
 
 [12]
 The Court quoted with approval the FCC's unequivocal rejection of an allocation requirement
 It is our view that the Commission is authorized to charge fees for those services that provide a value to identifiable recipients, which we have identified as activities associated with processing of applications that provide authorization for individuals, for example, to operate radio transmitters, or sell radio equipment, or collect common carrier charges. The fact that the general public may also benefit by Commission authorization of such activities, in that the activities may directly or indirectly provide a service to the public, does not limit the Commission's authority to charge a fee to the recipients of the services that will allow those services provided by the Commission to be operated on a self-sustaining basis as mandated in Title V. 48 F.C.C.2d 402, 404 (1974).
 180 U.S.App.D.C. at 255, 554 F.2d at 1114 n. 12.
 
 
 [13]
 Federal Power Commission v. New England Power Co., 415 U.S. 345, 350, 94 S.Ct. 1151, 1154, 39 L.Ed.2d 383 (1974), Quoting Bureau of the Budget Circular A-25, Sept. 23, 1959
 
 
 [14]
 See 42 U.S.C.A. § 2201(O ); C.F.R. §§ 50-70 (1978)
 
 
 [15]
 See 42 U.S.C.A. § 4332(C)
 
 
 [16]
 National Cable Television Association, Inc. v. United States, 415 U.S. 336, 340, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974)
 
 
 [17]
 But see Public Service Co. v. Andrus, 433 F.Supp. 144 (D.Colo.1977). An illustrative contrast to a NEPA statement prepared in connection with an individual license would be a programmatic NEPA statement prepared by the Commission on its own instigation in support of a general agency program expected to have significant benefit both for the public and for private recipients as yet unidentified. See, e. g., the Commission's Draft Generic Environmental Impact Statement on Handling and Storage of Spent Light Water Power Reactor Fuel, NUREG-0404, March, 1978. Such a statement creates an "independent public benefit" in the sense used by the District of Columbia Circuit in Electronic Industries Association v. F.C.C., 180 U.S.App.D.C. 250, 256, 554 F.2d 1109, 1115 (1976). Costs of such generic activities are excluded from the Commission's fees
 
 
 [18]
 We do not agree with the petitioners that the Commission's decision to exclude the costs of contested hearings from fee computation is arbitrary and capricious. In view of the difficulty in estimating in advance the costs of such proceedings, we believe the Commission's decision to exclude these costs from recovery is a wise one, although we express no opinion as to whether expenses incurred in contested hearings might properly be charged to the applicant
 
 
 [19]
 We do not believe that our conclusion is at odds with the statement of the Electronic Industries court, 180 U.S.App.D.C. at 258 n. 17, 554 F.2d at 1117 n. 17, that in some hearings the trial staff "presumably represents an independent public interest," since the court specifically recognized that its conclusion would depend upon the particular agency and type of hearing involved
 
 
 [20]
 A detailed description of how these fees are calculated is set forth in 42 Fed.Reg. 22149, 22158. In brief, the actual fee for a specific service is computed by multiplying the average professional manpower required (calculated in terms of man-hours or man-years) to perform the service times the professional man-year or man-hour rate (the cost per year or hour to maintain a professional employee), and then adding to that product the average share of the costs of the contractual support services. (A contractual support service is a service contracted for by the NRC to assist it in the review of applications, permits and licenses; approval of amendments; and performance of inspections.) This method of calculation ensures that only the overhead and technical support costs associated with the provision of special benefits are included in the Commission's fee schedule
 
 
 [21]
 The petitioners also object to the NRC's refund policy, labelling it "vague and uncertain." We find the Commission's refund procedure to be clear and precise. It is the Commission's practice to recover the entire renewal fee at the time the application is filed with the Commission. 10 C.F.R. § 170.12(d) (1978). Due to the Commission's limited experience in renewing waste disposal licenses, its estimate of the costs of renewal will necessarily not be as precise as other calculations made by the Commission where it has had more experience. Even so, after the Commission has completed its review of a renewal application, it will examine computer printouts to ascertain the exact cost of providing this service. If the costs exceed the amount of the renewal fee, no additional charge will be assessed. If actual costs are less than the fee, the difference will be refunded. We do not find this procedure to be an abuse of agency discretion or arbitrary and capricious. To the extent that the requirement of full payment at the time of application proves burdensome, an applicant may avail himself of the waiver procedure under 10 C.F.R. § 170.11(b) (1978)