**NEVADA POWER COMPANY, Plaintiff,**

v.

**James G. WATT,\* Secretary of the Interior; Frank Gregg, Director of the Bureau of Land Management; and Paul L. Howard, Director of the Utah State Office of the Bureau of Land Management, Defendants.**

No. C–78–0174.

United States District Court,
D. Utah, C. D.

April 24, 1981.

\* Substitution of party pursuant to Fed.R.Civ.P. 25(d).

Elliott Lee Pratt and Thomas R. King of Clyde, Pratt, Gibbs & Cahoon, Salt Lake City, Utah, for plaintiff.

Ronald L. Rencher, U. S. Atty., and Wallace T. Boyack, Asst. U. S. Atty., Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION

CHRISTENSEN, Senior District Judge.

Nevada Power Company (Nevada Power), the above-named plaintiff, filed applications for, and is maintaining related proceedings to obtain, necessary rights-of-way for the construction of the Allen-Warner Valley Electric Generation and Transmission System to be built in Nevada and southern Utah to furnish electricity to portions of southern Utah, Nevada and California. Rights-of-way for the purpose have to be obtained from the Bureau of Land Management (BLM) charged with the control of the public lands involved. As part of the procedure for obtaining such rights-of-way, Nevada Power submitted an Environmental Assessment (EA) to the Bureau. The Bureau issued an Environmental Impact Statement (EIS).

In the course of processing the application for the rights-of-way, the Bureau required plaintiff to make deposits for the reimbursement of costs incurred by the Bureau in the preparation of the EIS, and plaintiff has made those deposits under protest.

By the present action plaintiff seeks, *inter alia*, a declaratory judgment that the regulations under which the Secretary assessed and required deposits for such costs are invalid and that the administration of the cost-reimbursement program of the defendants is invalid. It has now filed a motion for summary judgment declaring that "the regulations 43 C.F.R. 2802.1–2 and 2803.1–1," under which the Secretary assessed and required deposits for such costs, "are invalid and unconstitutional as they are invoked by the Defendants in requiring reimbursement by plaintiff of all actual EIS costs"; that the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq.* (FLPMA), § 1734(b), requires the Secretary to consider the factors of reasonableness, "in the absence of which the statute is unconstitutional as a basis for assessing EIS costs to the Plaintiff"; that the plaintiff is entitled to a refund of the moneys invalidly assessed and paid out, and an order requiring the defendants to make said refunds; that the court should grant summary judgment ordering the defendants "to continue to process Plaintiff's applications and Environmental Impact Statements and enjoining the Defendants from assessing the Plaintiff for costs which the Court determines are invalid under the above legal principles," and ordering defendants to account to plaintiff for all costs assessed to and paid by the plaintiff "in order to properly allocate said costs in accordance with the Judgment of the court herein."

The defendants too have filed a motion for summary judgment premised upon a denial of plaintiff's basic contentions and maintaining that the defendants in requiring the deposits in question acted within the discretion of the Secretary and in harmony with governing statutes and regulations, and that the court should declare their actions valid and reasonable.

Defendants apparently do not dispute the jurisdiction of this court over the subject matter of the controversy generally. They do contend that it is without jurisdiction to grant an order requiring the repayment of funds because the Court of Claims has exclusive jurisdiction over such matters.

*Factual Background* : [1]

The plaintiff, a Nevada corporation licensed and authorized to do business in the states of Arizona, Utah and Nevada, is a public utility engaged in the generation, transmission and distribution of electric power. It is the sponsoring entity of the proposed Allen-Warner Valley Energy System to be built in southern Utah and southern Nevada with transmission facilities extending through Utah, Nevada, Arizona and California. The proposed system is to consist of several power plants, a coal slurry pipeline system, transmission and communication systems, and a water project, which will supply cooling water for one of the power plants as well as culinary and irrigation water to surrounding communities.[2]

Since the components of the Allen-Warner Valley Energy System are to be located primarily on federal land, plaintiff and other participants in the Energy System have applied to the Bureau of Land Management for various rights-of-way, as required by 43 U.S.C. §§ 959 and 961, and the FLPMA § 501, 43 U.S.C. § 1761.

The National Environmental Policy Act (NEPA) requires that Environmental Impact Statements (EIS's) be prepared for projects that involve major federal actions affecting the human environment, 42 U.S.C. § 4332(2)(C). The BLM decided on November 18, 1974, that an EIS would be prepared for the proposed system. After Nevada Power submitted a six-volume EA, describing the Energy System and analyzing its environmental impacts, the BLM prepared its own EIS containing material from the Nevada Power EA; an analysis of six alternatives, including the proposed Energy System; and for most of the alternatives, an analysis of potential impacts on air quality, water resources, vegetation, wildlife, cultural resources (archaeology, ethnology and history), recreation and aesthetics, wilderness, land use, socioeconomics, coal resources, energy efficiency and unavoidable adverse impacts. All of the right-of-way applications involved here are still pending and cannot be granted until sometime in 1981 when the NEPA process is completed.

The BLM has assessed plaintiff in advance for all of the costs for work to be done in processing the right-of-way applications relating to the Energy System. These assessments have included costs incurred in the preparation of the EIS. To date, plaintiff's payments total $1,404,052.34, all of which have been made under protest.

Plaintiff appealed defendants' original assessment of costs to the Interior Board of Land Appeals; the appeal was dismissed without prejudice on June 10, 1980, together with certain other appeals, pending the outcome of the present suit in Federal District Court. The agency's order of dismissal is enigmatic with respect to the question of exhaustion of administrative remedies.[3] However, inasmuch as the point is not relied upon by either side, the agency has declined to proceed further on the related administrative appeal until this case is decided by this court, and further action is to be directed on the part of the Secretary

---

1. These facts are well documented and organized by counsel for the plaintiff, relying largely upon defendants' answers to interrogatories, answers to requests for admission, and exhibits filed with the court.

2. The Warner Valley Power Project is dependent upon the water project for its water supply. If the power plant is not built, the Water Project may still be built, but possibly on a reduced scale if funded by the State of Utah.

3. The Bureau of Land Management on May 16, 1980, filed with this Board a motion to dismiss the above-captioned appeals [footnote reference to Nevada Power's appeal together with certain other appeals omitted] without prejudice to future proceedings before the Board, on the ground that the issues in the litigation pending before the Utah District Court and the Tenth Circuit will be dispositive of the issues in the appeals before the Board.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the captioned appeals are dismissed without prejudice. This action does not constitute a waiver of the Government's right to assert a defense based upon plaintiffs' failure to exhaust administrative remedies.

(Order signed by Frederick Fishman, Administrative Judge, and concurred in by other Administrative Judges, dated June 10, 1980.)

after remand, it is concluded that we should proceed to judgment here.

*Statutory and Regulatory Background*:

The FLPMA provides in section 504(g), 43 U.S.C. § 1764(g), that the Secretary may require an applicant for a right-of-way to reimburse the United States for "all reasonable administrative and other costs" incurred in processing the application. Reimbursement of reasonable costs may be obtained in two ways: "by regulation or prior to promulgation of such regulations, as a condition of a right-of-way."

Section 510(a) of the FLPMA, 43 U.S.C. § 1770(a), provides that the provisions of Title V, including section 504(g), shall apply to all right-of-way applications pending on or filed after the effective date of the FLPMA (October 21, 1976).

Section 310 of the FLPMA, 43 U.S.C. § 1740, provides that the Secretary "shall promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands." The promulgation of rules and regulations is to be governed by the provisions of Chapter 5 of the Administrative Procedure Act. Until rules and regulations are promulgated, the lands are to be administered under existing rules and regulations to the extent practical.

Section 304(b), 43 U.S.C. § 1734(b), provides that "reasonable costs" for the purposes of that section include the costs of Environmental Impact Statements, and further that in determining whether costs are reasonable, the Secretary may take into consideration various factors, these provisions to be more specifically noticed hereafter since they are critical to a resolution of the issues before the court.

The Independent Offices Appropriation Act of 1952 (IOAA) provides in 31 U.S.C. § 483a that services provided by federal agencies to any person, except those engaged in official government business, are to be self-sustaining to the full extent possible. The heads of agencies are authorized to promulgate regulations to prescribe "such fee, charge, or price, if any, as he shall determine ... to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts."

The Public Land Administration Act (PLAA), § 201, 43 U.S.C. § 1371, which was repealed by the FLPMA, provided that the Secretary could establish reasonable filing fees, service fees and charges with respect to applications relating to public lands. Section 204, 43 U.S.C. § 1374, provided for refunds in the case of payments that were not required or were in excess of the amount required.

The Secretary of the Interior adopted the original Reimbursement Regulations under authority of the IOAA and the PLAA. The regulations became effective June 1, 1975. 43 C.F.R. § 2802.1–2 (1975). On June 26, 1980, the Secretary signed regulations revising 43 C.F.R. Part 2800, effective July 31, 1980, 45 Fed.Reg. 44518 (July 1, 1980). The revisions included the reissuance of the initial Reimbursement Regulations. The number of the regulations was changed from 43 C.F.R. § 2802.1–2 to § 2803.1–1. Hereinafter we cite the old numbering.

Under the Reimbursement Regulations, an applicant for a right-of-way across public lands must submit with his application a non-returnable payment in an amount fixed by the regulations and based on the length or size of the right-of-way sought. § 2802.-1–2(a)(3). Upon receipt of the application, the authorized BLM officer must estimate the costs expected to be incurred by the government in processing the application, including the costs of preparing EA's and EIS's pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347. § 2802.1–2(a)(4).

If the authorized BLM officer determines that actual costs will exceed the non-returnable payment by an amount greater than the costs to the government of maintaining actual cost records on the application, the applicant is required to make periodic payments of those estimated costs. § 2802.1–2(a)(4). Before a right-of-way is issued, the applicant must reimburse the government

for all actual costs incurred in excess of the estimate. § 2802.1–2(a)(5). An applicant whose application is denied or withdrawn is nonetheless responsible to reimburse the government for the processing costs it incurred. § 2802.1–2(a)(6), (7).

The Reimbursement Regulations also require that, after the right-of-way is issued, the holder must reimburse the government for costs of monitoring construction, operation, maintenance and termination of authorized facilities, and the protection and rehabilitation of the lands involved. § 2802.1–2(b)(1).

Two components make up "actual costs" under the BLM's interpretation of the Reimbursement Regulations, "direct costs" and "indirect costs." "Direct costs" derive from activities such as preparing EA's and EIS's pursuant to the NEPA; land examination and field inspection of proposed rights-of-way; preparation and processing of necessary documents; public relations and public affairs work; employee training and safety training; and supervision and inspection of rights-of-way. For each of these activities, the types of costs charged as "direct costs" include salaries of BLM employees, prorated according to time spent on the right-of-way project; the personnel benefits of BLM employees (i. e., retirement and health benefits); travel and transportation of persons and things; contractual services; rental of equipment; costs of

printing and reproduction; and costs of supplies and materials. Included in the "direct cost" of preparing an EIS is the expense of assuring compliance with the mandates of various other public laws. For example, the BLM must survey flora and fauna to determine if any endangered species or critical habitat would be affected. Endangered Species Act, 16 U.S.C. §§ 1531 et seq. Plaintiff is also required to bear the total direct costs for surveys to determine whether any cultural and archaeological resources included or eligible for inclusion in the National Register of Historic Places would be affected. National Historic Preservation Act of 1966, 16 U.S.C. §§ 470 et seq.[4]

"Indirect costs" are costs that cannot be identified with a particular right-of-way project. They include salaries of general administrative personnel; costs of certain organizational components such as the BLM Record System Division, Office of Equal Employment Opportunity, and safety officers; and miscellaneous expenses such as telephone bills, office space rental, postage and employee transfer costs. Indirect costs are added to the direct costs by charging the applicant an additional percentage of the direct costs. During the period relevant to this case, the BLM established an "indirect costs" charge of approximately 15 percent of direct costs.[5]

4. Under the Wilderness Act of 1964, 16 U.S.C. §§ 1131 et seq., the Secretary of the Interior is required to review certain roadless areas to determine their suitability for preservation as wilderness. 16 U.S.C. § 1132(c). Such wilderness reviews are also required by the FLPMA, § 603, 43 U.S.C. § 1782, regardless of whether a right-of-way application is filed. Wilderness reviews have been conducted in connection with applications for rights-of-way in all roadless areas, not previously reviewed, within five miles of a proposed route. Although the BLM has in the past charged some right-of-way applicants for costs incurred in conducting wilderness reviews, in 1978 the BLM determined such charges were not proper because such reviews are required under § 603 of the FLPMA independently of right-of-way applications. Applicants, including plaintiff, who have been charged for such reviews will be given a refund or a credit of amounts so charged.

5. Originally, the indirect costs charge under the Reimbursement Regulations was assessed at a rate of 30% of direct costs. Inasmuch as the FLPMA, § 304(b), precluded recovery of "management overhead," the BLM subsequently took the position, in Organic Act Directive No. 76–16, that some indirect costs could not be recovered, including costs of executive direction, managerial-staff support, managerial-program coordination, and managerial-program evaluation. The BLM reduced the indirect cost rate to 22%. The Office of the Inspector General of the Department of the Interior concluded in 1978 that the BLM had no basis in its costs data or accounting records for the 30% and 22% rates used before fiscal year 1978. The Office determined that for fiscal years 1974 to 1977, the rates should have been respectively 13.9%, 14.5%, 15.7% and 17.1%. In conjunction with the Office of the Inspector General, the BLM established an indirect cost rate of 15.4% for fiscal years 1978 and 1979 and

*Parties' Contentions*:

Nevada Power's argued contentions in brief are:

(1) The Reimbursement Regulations are invalid in not complying with the FLPMA mandate of reasonableness;

(2) The Secretary must consider the factors of reasonableness referred to in section 304(b);

(3) The Reimbursement Regulations do not provide for considering the factors specified by the FLPMA, section 304(b);

(4) Costs charged for BLM work included in the EIS but required independently are not reimbursable;

(5) Constitutional considerations indicate that to disregard the FLPMA's "reasonable standards" would be to compound the prohibition against taxation by the Executive inasmuch as the public benefit, the benefit to the recipient, and the concepts of reasonableness would be disregarded.

The defendants take issue with most of these contentions and argue that under the property clause of the Constitution the Congress has delegated to the Secretary authority to administer the public lands and to impose reasonable fees on applicants for special privileges and benefits; that FLPMA grants the Secretary discretionary authority to impose reasonable fees and in addition the Public Land Administration Act and the Independent Offices Appropriation Act granted the Secretary authority to recover costs; that Congress has reaffirmed EIS cost recovery; that the courts have upheld the assessment of EIS costs; that the regulations allow for the recovery of "reasonable costs" from right-of-way applicants; and that the regulations as promulgated and implemented are not an unlawful or unreasonable application.

Defendants further claim that "reasonable costs" are the "actual costs" incurred by the United States in processing right-of-way applications. Defendants admit that the only factor the BLM directly considered and made allowance for under the Reimbursement Regulations was "actual costs" to the government, but defendants maintain that all other factors, with the exception of the "monetary value of the rights or privileges sought by the applicant," had already been taken into consideration by Secretarial Order No. 3011, and by the reissued regulations, and that in any event before reaching the conclusions that "actual costs" should control, the Secretary did "consider other criteria." The BLM takes the further position that consideration of the factors listed in section 304(b) is discretionary and that the Secretary may decide to include or exclude any or all of them from consideration. Defendants further contend that all benefits of the project accrue to plaintiff and that there are no public benefits:

All of the cost of the work on the project provides a benefit to Plaintiff as a right-of-way applicant. If no applications for a right-of-way were filed, the Defendant would not have been required to do any work at all. If no applications were filed for the project, then no processing costs, no studies, reports of Draft EIS would be undertaken. But for the project of the Plaintiff, no costs and no need to comply with NEPA. Plaintiff is a private utility, and as the project sponsor would reap all of the benefits of the project.

The BLM accounting system was, established to reflect the cost of the entire project, coded to the project as a whole and not to individual studies, segments, or fragment [sic] thereof. The cost accounting system is not designed to provide cost for individual segments, studies, or components going into the whole EIS.

Costs for some studies can be identified because they were done on a contract basis. Most of the individual studies in the EIS, however, were prepared by an inter-disciplinary team that worked on the whole document. Defendants maintain that separation of costs for individual studies would be

13.8% for fiscal year 1980. The BLM is in the process of recomputing indirect costs for all years since 1974, stating it will credit or refund

the difference between indirect costs actually charged and those which would have been charged under the revised rates.

a needless and unnecessary process under any accounting system. The government has made no effort to modify the BLM accounting system to enable it to break out or segregate the total cost of a particular study or section of the EIS. Defendants do not claim to have kept cost records which distinguish costs according to the six factors found in FLPMA, § 304(b). Defendants claim simply that actual costs are "reasonable" costs under FLPMA, § 304(b).

*Discussion* :

While the record presented is complex, the statutes and cases cited numerous, and the arguments of counsel detailed and convoluted, I am of the opinion that after all has been said and done, the proper answers to the problems that have been so comprehensively and well debated can be best found in the FLPMA itself in the light of two cases.

*National Cable Television Assn. v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), involved an interpretation of the IOAA, authorizing each federal agency to prescribe by regulation such fees for the agency's services as were determined to be fair and equitable, taking into consideration the direct and indirect "cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts." Plaintiff was a trade association representing television transmitting systems. The Federal Communications Commission had imposed filing fees that generated approximately 20 percent of the agency's funds, and an "annual fee" for each cable television system; this latter fee was set at 30 cents per subscriber. Plaintiffs challenged only the latter fee.

Justice Douglas noted for the Court that taxation is a legislative function, and that no agency has the power to tax unless Congress clearly delegates that authority to the agency and supplies adequate standards to guide the agency. In order to avoid constitutional problems, the IOAA was read narrowly as allowing only a "fee" but not a "tax." To qualify as a "fee," however, the charge had to meet several criteria. Chief among these was the requirement that the charge must be for a benefit bestowed on the applicant apart from the benefits inuring to the general public. The Court stated that this implicitly prohibited a regulatory agency from recouping all of its regulatory costs and thus requiring regulated entities to pay not only for benefits received by them but also for all of the benefits received by the general public. In defining the "measure of the authorized fee," the court indicated that a " 'fee' connotes a 'benefit' and the Act by its use of the standard 'value to the recipient' carries that connotation." 415 U.S. at 341, 94 S.Ct. at 1149. Finally the Court indicated that the FCC could not base its fee determinations on broad factors such as "public policy," for to do so would usurp legislative prerogatives and activities. *See also FPC v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974).

In *Alumet v. Andrus*, 607 F.2d 911 (10th Cir. 1979), it was held, among other things, that the express legislative mandate of FLPMA is that all reasonable costs incurred by the Secretary of the Interior in processing an application for rights-of-way on public lands shall be chargeable against the applicant for such rights-of-way and that reasonable costs include, *inter alia*, costs of environmental impact statements, but that it should be assumed that Congress was aware, in so providing, of the limitations to the delegation of authority as flagged in *National Cable*. It was further indicated that the language of section 304(b) of the FLPMA reflects that understanding and that "Congress expressed that the Secretary should consider the benefit to the general public in its attempted recoupment of costs of an EIS."

A multitude of other cases has been cited by counsel. Only one of them—*Miss. Power & Light Co. v. U.S. Nuclear Regulatory Com'n.*, 601 F.2d 223 (5th Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980), primarily relied upon by the defendants—is at all persuasive. We have concluded that this case should not be accepted as controlling here because, among other reasons, it construes statutes essen-

tially different than FLPMA. Section 304(b) of the FLPMA in light of all of these cases, and especially *National Cable* and *Alumet*, is clearly "in point." By the same token, while the Independent Offices Appropriation Act, *supra*, and other provisions of FLPMA are instructive in the light of the cases cited, it is upon section 304(b) of the FLPMA, 43 U.S.C. § 1734(b), by way of comparison that we must focus to best perceive controlling considerations.

The Secretary urges that sections 310 and 504(g) of the Act, 43 U.S.C. §§ 1740, 1764(g), dealing with "rights-of-way," are the provisions which are specifically directed at the problems before us, and that they emphasize the broad discretionary powers of the Secretary. Section 310 provides for the promulgation by the Secretary of regulations with respect to the public lands to carry out the purposes of the Act and that prior to their promulgation the lands "shall be administered under existing rules and regulations ... to the extent practical." Section 504(g) authorizes the Secretary to require a right-of-way applicant "to reimburse the United States for all administrative and other costs incurred in processing an application." While these provisions are relevant to this determination, section 304, dealing specifically with the deposit of the reasonable costs of "applications" and particularly the "deposit" of reasonable costs for, among other things, "environmental impact statements," which this case precisely involves, is the special provision rather than the more general one and should be looked to primarily as a guide. *See Alumet, supra.* Other provisions of law [6] may well illuminate the intent of Congress, yet the primary task is to interpret section 304 of the FLPMA, which in my view particularizes the context in which the present problem is to be decided. Hence, we turn to section 304 (43 U.S.C. § 1734) which reads in pertinent part:

## SERVICE CHARGES, REIMBURSEMENT PAYMENTS, AND EXCESS PAYMENTS

(a) Notwithstanding any other provisions of law, the Secretary may establish reasonable filing and service fees and reasonable charges, and commissions with respect to applications and other documents relating the public lands and may charge and abolish such fees, charges and commissions.

(b) The Secretary is authorized to require a deposit of any payments intended to reimburse the United States for reasonable costs with respect to applications and other documents relating to such lands.... As used in this section, "reasonable costs" include, but are not limited to, the cost of special studies; environmental impact statements; monitoring construction, maintenance and termination of any authorized facility; or other special activities. In determining whether costs are reasonable under this section, the Secretary may take into consideration actual costs (exclusive of management overhead), the monetary value of the rights or privileges sought by the applicant, the efficiency to [sic] the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs.

Section 310 directs the Secretary to promulgate rules and regulations to carry out the purposes of the Act and other laws applicable to the public lands. Prior to the promulgation of these regulations, "such lands are to be administered under existing rules and regulations to the extent practi-

---

**6.** The Independent Offices Appropriation Act of 1952, 31 U.S.C. § 483a, expresses the sense of Congress that various benefits granted to private interests shall be self-sustaining "to the full extent possible" on the basis of "fair and equitable" pricing, taking into consideration "direct and indirect costs to the government, value to the recipient, public policy or interest served, and other pertinent facts. Similarly, the Public Land Administration Act, 43 U.S.C. § 1371, replaced by FLPMA, granted broadly stated powers to the Secretary in establishing and changing fees for applications.

cal." I take it that one of the limiting impracticalities would be the conflict of the existing regulations with section 304(b).

The Reimbursement Regulations, 43 C.F.R. § 2802.1–2, read as follows:

*Reimbursement of costs.* (a)(1) An applicant for a right-of-way or a permit incident to a right-of-way shall reimburse the United States for administrative and other costs incurred by the United States in processing the application, including the preparation of reports and statements pursuant to the National Environmental Policy Act (42 U.S.C. 4321–4347), ...

. . . .

(8) If payment ... exceeds actual costs to the United States, a refund may be made by the authorized officer from applicable funds, under authority of 43 U.S.C. 1374. . . .[7]

By Order of the Secretary of the Interior, Order No. 3011, "reasonable costs" were identified and interpreted to be the "actual costs" incurred by the BLM in the processing of the applications, including the EIS. The particular wording of the Order is set forth below:

Sec. 1 *Purpose.* The purpose of this Order is to implement the cost recovery provisions of FLPMA, sections 304 and 504(g), 43 U.S.C. §§ 1734, 1764(g) (Supp. 1977), as to applications for and monitoring of rights-of-way over the public lands.

Sec. 2 *Implementation.* Section 304 of FLPMA, 43 U.S.C. § 1734, is hereby implemented as to applications for rights-of-way over public lands which were pending on October 21, 1976, or which have since been filed. . . . The regulations at 43 C.F.R. 2802.1–2 (1976) shall be applicable to such applications or holder monitoring activity until new regulations implementing Title V of FLPMA become final. It is my finding that "reasonable costs" under Sections [sic] 304 of FLPMA for processing applications for rights-of-way over public lands and for monitoring right-of-way holder activity, are the actu-

al costs incurred by the United States in performing statutory responsibilities necessitated by such applications or rights-of-way. The term "reasonable costs" means the same as the term "administrative and other costs" as used in the regulations at 43 C.F.R. 2802.1–2(a)(1) (1976), and includes costs incurred in preparation of environmental impact statements.

Sec. 7 *Effective Date.* This Order is effective immediately. [September 29, 1977] Its provisions shall remain in effect until regulations are promulgated implementing Title V of FLPMA, or until it is amended, superseded, or revoked, whichever occurs first.

The unqualified language of the Regulation that "[a]n applicant for a right-of-way ... shall reimburse the United States for administrative and other costs incurred by the United States in processing the application, including the preparation of reports and statements pursuant to the National Environmental Policy Act," and of the Secretary's Order that "administrative and other costs" are the same as the "reasonable costs" of section 304(b) and include the cost of EIS preparation, and that the "reasonable costs" of right-of-way applications are the "actual costs incurred by the United States in performing statutory responsibilities necessitated by such applications," do not address or embrace the other considerations recited in the fourth sentence of section 304(b). I must at once reject the defendants' argument if I understand it correctly that to the extent the court may believe the regulations fail to do so it must yield to the proposition that what constitutes needful regulations respecting property belonging to the United States is committed to Congress and cannot be reweighed and set aside by the courts.

*Kleppe v. New Mexico,* 426 U.S. 529, 541 n.10, 96 S.Ct. 2285, 2292 n.10, 49 L.Ed.2d 34 (1976), and *Ivanhoe Irrig. Dist. v. McCracken,* 357 U.S. 275, 294–95, 78 S.Ct. 1174, 1185–86, 2 L.Ed.2d 1313 (1958), upon which the Secretary relies, support the authority

---

7. As noted above, the Secretary reissued these regulations on June 26, 1980, without signifi-cant revision. The reissued regulations are found at 43 C.F.R. § 2803.1–1.

of the Congress over federal public lands, without in any way throwing doubt upon its own power to limit any discretion it may vest in executive officers to control the public lands under established guidelines. An agency is constrained to exercise its discretion within the limitations imposed by Congress. Within the latter principle, however, the other arguments advanced by defendants in support of the regulations and administrative rulings merit careful and respectful examination.

To pass upon either the sufficiency of the regulations or the validity of the agency's action pursuant to them a determination must be made whether EIS's have been declared by Congress to be reasonable as a matter of law without any necessity for the Secretary to give consideration to their reasonableness in point of fact for the purpose of section 304(b).

It may be questioned whether Congress could validly determine as a matter of law that certain "fees" in the nature of taxes are reasonable; it cannot be doubted that if the Congress has the power to restrict charges to those that are reasonable, it also has the power to determine what factors are to be considered by an agency in determining whether the charges are reasonable or not within the guidelines of *Cable Television*. Implicit in *Alumet, supra*, is the authority of Congress to limit fees to those that are reasonable. The court reserved consideration of, but far from rejected, the idea that the factors listed in the fourth sentence of section 304(b) may qualify the general inclusion of EIS costs among those costs that may be charged to an applicant:

> An alternative reason given by the trial court for its action was based upon the statutory language of 43 U.S.C. § 1734. That statute first provides that the "reasonable costs" which may be charged against the applicant for a right-of-way over public lands include the cost of any environmental impact statement prepared and used in connection with the BLM's processing of such application. Stopping at that point in the statute, it would appear that Congress quite clearly in-

tended that the cost of preparing such an environmental impact statement would be borne by the applicant for a right-of-way. Admittedly, the statute in question goes on in a succeeding sentence to provide that in determining what costs are "reasonable" costs, the Secretary may take into consideration, among other things, "that portion of the costs incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant."

> The trial court reasoned that the latter statutory provision which allowed the Secretary to exclude that portion of the costs incurred for the benefit of the general public *completely negated* the former provision in the same statute that reasonable costs included the cost of an environmental impact statement. We are not in accord with such reasoning. If such were a proper construction, then the statement that reasonable costs include the cost of an environmental impact statement is meaningless. The latter statutory provision that the Secretary may consider that portion of the costs incurred for the benefit of the general public interest may well *modify* the earlier provision that reasonable costs include cost of an environmental impact statement, but the latter provision does not, in effect, excise the former provision from the statute.

> In sum, the trial court in granting summary judgment, ruled that the Secretary had no authority to seek reimbursement from Alumet for *any* part of the cost of preparing an environmental impact statement incident to Alumet's application for a right-of-way over public lands. In our view, such holding is erroneous.

607 F.2d at 916 (emphasis in the original).

The very point thus reserved by the circuit court with a directional nudge toward the modification theory is before us in this case.

Defendants attempt to dismiss the limitations imposed by *National Cable* and suggested in *Alumet*, in arguing that the "plain language" of the FLPMA and its legislative history demonstrate that Congress intended

to grant the Secretary discretion to impose reasonable costs and to determine that all of the costs of an EIS are reasonable. They further argue that the legislative history suggests Congress' determination to require the reimbursement of the costs for the preparation of an EIS, citing Senate Report 94–583 at 73 (1975) where the following discussion is found:

> In establishing regulations or in conditioning rights-of-way grants, the Secretary is to follow a standard of reimbursement which is fair and equitable, and as uniform as practicable, taking into consideration the direct and indirect costs to the Government, the value to the recipient, the public policy or public interest served and other pertinent factors.... This subsection is similar to Sec. 28(1) of

8. The Senate bill (S.507) that eventually was enacted as the Federal Land Policy and Management Act of 1976 was introduced on January 30, 1975. Senate Report No. 94–583 issued from the Committee on Interior and Insular Affairs on December 18, 1975, and commented in part:

> SERVICE CHARGES, REIMBURSEMENT PAYMENTS, AND EXCESS PAYMENTS
>
> *Section 302.* Subsections (a) and (c) authorize the Secretary to establish fees and charges and to refund money erroneously paid. These provisions are similar to provisions in Title II of the Public Land Administration Act (43 U.S.C. 1371–1374).
>
> Subsection (b) authorizes the Secretary to reimburse the extraordinary administrative and other costs incurred in processing applications and other documents relating to the national resource lands or in monitoring or other related special activities. Extraordinary costs include the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities. This requirement is similar to that imposed in section 28(1) of the Mineral Leasing Act of 1920 (41 Stat. 437), as amended by the Act of November 16, 1973 (87 Stat. 576, 579). It is expected that the Secretary will exercise flexibility in requiring reimbursement for extraordinary costs. The Secretary should take into consideration the extent to which applicants' proposals and the Federal programs to which the applications relate (e. g. proposals and programs concerning land and easement exchanges and cost-sharing agreements) are mutually beneficial to the Federal government and provide significant public benefits.

the Mineral Leasing Act of 1920, as amended by the Act of November 16, 1973 (87 Stat. 576, 579).

I find nothing plain to this effect in the foregoing or any other legislative history. To the contrary, the legislative history suggests, and the language of section 304(b) in view of that legislative history confirms, that the framers of section 304(b) did variously consider the preclusion of cost recovery for EIS's and the making of such recovery mandatory, and that they finally intended to leave to the Secretary the determination of the extent to which costs of EIS's and other expense necessitated by application for rights-of-way were reasonable in·each instance after consideration of specified guidelines incorporated within section 304(b).[8]

S.Rep.No.583, 94th Cong., 1st Sess. 55–56 (1975). When S.507 was approved by the Senate on February 25, 1976, Section 302 read in pertinent part as follows:

> SERVICE CHARGES, REIMBURSEMENT PAYMENTS, AND EXCESS PAYMENTS.—
>
> (a) Notwithstanding any other provision of law, the Secretary may establish filing fees, service fees and charges, and commissions with respect to applications and other documents relating to national resource lands and may change and abolish such fees, charges, and commissions.
>
> (b) The Secretary is authorized to require a deposit of any payments intended to reimburse the United States for extraordinary costs with respect to applications and other documents relating to national resource lands. The moneys received for extraordinary costs under this subsection shall be deposited with the Treasury in a special account and are hereby appropriated and made available until expended. As used in this subsection, "extraordinary costs" include but are not limited to the costs of special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities.

S.507, 94th Cong., 2d Sess., 122 Cong.Rec. 2370 (1976).

A similar bill, H.R.13777, was introduced in the House on May 13, 1976, and contained the following provisions:

> SERVICE CHARGES, REIMBURSEMENT PAYMENTS, AND EXCESS PAYMENTS
>
> SEC. 303. (a) Notwithstanding any other provision of law, the Secretary may establish reasonable filing and service fees and reasonable charges, and commissions with respect to applications and other documents relating

to the public lands and may change and abolish such fees, charges, and commissions.

(b) The Secretary is authorized to require a deposit of any payments intended to reimburse the United States for reasonable costs with respect to applications and other documents relating to such lands. The moneys received for reasonable costs under this subsection shall be deposited with the Treasury in a special account and are hereby authorized to be appropriated and made available until expended. As used in this subsection, "reasonable costs" include but are not limited to the costs of monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities.

H.R.13777, 94th Cong., 2d Sess. (1976), reprinted in Senate Comm. on Energy and Natural Resources, 95th Cong., 2d Sess., Legislative History of the Federal Land Policy and Management Act of 1976, 223, 278–79 (1978).

In House Report No.94–1163, the Committee on Interior and Insular Affairs commented on May 15, 1976, on the foregoing provisions:

*Section 303—Service Charges, Reimbursement Payments, and Excess Payments*

The Secretary of the Interior is authorized to establish reasonable fees and charges and to refund moneys erroneously paid and to require reimbursement for "reasonable costs." The Committee expects collection of such costs only when the amounts are substantial and failure to collect would amount to an unwarranted subsidy by the Federal taxpayer. It expects also that the Secretaries will take into consideration the benefits to public programs in determining whether collection of specific costs is appropriate under this section and under Title V.

H.R.Rep.No.1163, 94th Cong., 2d Sess. 15, reprinted in [1976] U.S.Code Cong. & Ad.News 6175, 6189.

The differences between these Senate and House provisions were among the discrepancies taken up by the Conference Committee. Following are excerpts from the transcript of the proceedings of that committee:

Mr. Quarles. The next matter of difference occurs on page 52, line three. This concerns the authorization of the Secretary to require to deposit by respective users of public lands the cost of processing the applications and other documents relating to that use.

The Conferees will recall it is similar to a provision already in the Alaska Pipeline Bill. The Alaska Pipeline Bill did not have any adjective in front of costs, it simply said administrative costs. The Senate provision says extraordinary costs. The House provision says reasonable costs.

After lengthy discussion amongst Staff in which it must be admitted Staff was not certain what the definition of either term would be, we concurred in suggesting at least for the Conferees consideration, the adjective "reasonable." These would be the kind of costs that the Secretary could require deposits on.

Congressman Santini. Is that agreeable with the Senate?

Senator McClure. Mr. Chairman, I have very great difficulty with this. As we go into more and more specialized studies on use of the public lands, I know there will be a debate over whether the applicant who triggers the study ought to pay for that study, but those studies become very, very expensive.

. . . .

Congressman Young. I can envision—I go back to the acquisition of a homesite, or the recreational site, the environmental impact statement would have to be filed, this could put everybody out of business.

. . . .

Senator Haskell. I think Jim McClure has a point. I think there has to be a line drawn. I don't know how to do it, but my viewpoint is, where an application triggers the direct cost, that should be on the applicant. On the other hand, the applicant should not pay for the background studying and the developing of the overall plan. Now how we draw the line, Jim, I don't know. Can we pass this over and ask the Staff to be a little imaginative?

Senator McClure. The Supreme Court has very recently said where the expenditure is for a public interest rather than a private interest, that it constitutes a tax and not a fee and specifically held in that instance, the fee could not be assessed. I think we have that kind of problem when we look at EIS's which are really designed to protect the public interest rather than try to determine whether or not the applicant has a right.

Senator Haskell. Let's assume a utility company asked to locate on public lands. This requires an EIS. Under your theory, would you have the utility company pay for the EIS or not?

Senator McClure. I think not.

Senator Haskell. Then we disagree.

. . . .

Senator McClure. I responded as I did on the power line instances because I don't know where you draw the line. . . . I have to go all one way or all the other because I do not know how to draw a line that could stand the test short of that.

. . . .

Congressman Santini. I don't know if we will be able to reconcile the differences of the two concepts. . . .

. . . .

[W]e will pass on the issue of "Reasonable" at line 52 in order to afford Staff an opportunity to review that language, number one, for constitutional validity; number two, for possible modification to meet the concerns expressed.

If the Congress had declared by the third sentence in section 304(b) that the costs of an EIS and the other activities specified are to be deemed reasonable as a matter of law so that the Secretary is authorized or required to order reimbursement without further inquiry, serious question would exist as to constitutionality in light of *National Cable*. The fourth sentence of the subsection in effect would have to be excised (an operation which in reverse *Alumet* rejected), and other costs mentioned in tandem with EIS costs in the third sentence, *i. e.*, "the costs of special studies . . . monitoring con-

struction, operation, maintenance and termination of any authorized facility; or other special activities," would be covered as a matter of law without further inquiry or consideration on the part of the Secretary. It is unreasonable to suppose that the careful guidelines of the fourth sentence of 304(b) would have to be utilized in the Secretary's consideration of the reasonable costs of some nebulous, undefined and almost imperceivable activities triggered by an application, but could be thrown out the window with respect to the major and al-

---

Dept. of Interior, Legislative History of the Federal Land Policy and Management Act of 1976, Vol. 18, Unpublished Meeting and Markup Transcript at 28–33 (September 15, 1976) (Ex. 10).

In a subsequent committee meeting, Congressman Young presented the following staff proposal:

In determing [sic] whether charges are reasonable under this section, the Secretary may take into consideration actual costs exclusive to management overhead, or monetary value of rights or privileges sought by the applicant, the efficiency of the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided and other factors relative to determine the reasonableness of the charges.

. . . .

Senator Haskell. That sounds all right to me.

Congressman Santini. It is pretty innocuous, Mr. Chairman.

Senator McClure. Mr. Chairman, I assume what we are trying to do in this instance is to balance the equities that are involved, but we do not want to simply in every instance say that the government will absorb all of the costs of the studies and of the administrative procedures. But on the other hand, to say that we don't always want the applicant to bear all of the costs.

There has got to be a reasonable balance between the two. I don't know how you define that because I do not think we would ever get Congress to agree that the applicant must pay all of them all of the time, nor will we get Congress to agree, nor this committee to agree, that the government would pay all of the costs in every instance.

Perhaps we have to go with something like this.

Senator Haskell. This is what this is saying. It gives guidelines.

Senator McClure. I would assume also that this would allow an administrative re-

view or a court review of the abuse of the person making the charges.

I think it might be well to have the record reflect that that is what we intend with the addition of this language.

Dept. of Interior, Legislative History of the Federal Land Policy and Management Act of 1976, Vol. 18, Unpublished Meeting and Markup Transcript at 25–28 (September 20, 1976) (Ex. 10).

House Conference Report No. 94–1724, September 29, 1976, summarized the relevant conclusions of the committee of conference as follows:

20. The Senate bill's and the House amendments' provisions for service charges differed in certain respects. The conferees acted on the differences as follows:

(a) They adopted the House amendments' use of the adjective "reasonable" to modify charges and costs; the adjective is implicit in the Senate bill except where the adjective "extraordinary" was used. The conferees substituted "reasonable" for "extraordinary," giving the Secretary of the Interior greater policy leeway in determining whether reimbursement of costs will be required at both the lower and upper levels of charges.

(b) They agreed to eliminate direct appropriation of moneys paid for reimbursement of costs.

(c) They agreed to mention specifically the "reasonable costs" of doing special studies and preparing environmental impact statements as was done in the Senate bill. The conferees wrote into the bill factors to be considered by the Secretary in determining whether charges are in fact reasonable.

H.R.Conf.Rep.No.1724, 94th Cong., 2d Sess. 61, reprinted in [1976] U.S.Code Cong. & Ad.News 6228, 6233.

As approved by the House on September 30, 1976, the Senate on October 1, 1976, and signed by the President on October 21, 1976, the FLPMA provision in question has already been quoted, *supra*.

most exhaustive list of expectable activities occasioned thereby. It should not be readily assumed that Congress inserted language in the fourth sentence of the subdivision in question with such inconsequential purpose.

That Congress did not mean these guidelines to be disregarded even with respect to the matters listed in the third sentence as being included in the term "reasonable costs" is again evident by the express exclusion of "management overhead" in the fourth sentence which the agency recognizes as a limitation in its right to require deposits for the costs of EIS's. If the Secretary is required to consider this limitation in fixing reasonable costs for EIS's by reason of the fourth sentence, it seems incongruous for him to disregard the other standards in that sentence.

If the defendants mean to suggest that the Secretary must require reimbursement of all actual costs of the EIS notwithstanding the fact that counterbalancing considerations would otherwise persuade his reasonable discretion, the same type of absolutism which was rejected in *Alumet* as one extreme may have brought the government to an opposite and equally unjustifiable extreme. The Regulations equating the measure of "reasonableness" to "actual costs" seem such an extreme.

The defendants seek to avoid any absolute posture by arguing that the element of "actual costs" expressly adopted in the Regulations and Secretarial Order assimilates various standards recited in the fourth sentence of section 304(b); that in any event most of these standards were considered and to the extent they were not considered the Secretary had the discretion to consider them or not.[9]

The ambivalence of these statements does not reflect any failure on the part of able counsel to present the positions of the Secretary in their best light, but rather the simultaneous attraction and repulsion toward the statutory standards for reasonableness inherent in, and perhaps essential to, the Secretarial Order and its application in this case.

Shorn of its moderating adornments in accordance with the final statement of counsel as quoted in the margin, and perhaps because of its unencumbered simplicity, this position of the defendants is facially plausible and attractive. If regarded as encompassed in legislative rulemaking not inconsistent with the statute it could be

**9.** Near the close of the oral argument of the Motions for Summary Judgment the following occurred:

> THE COURT: Now ... your answer to the question of whether the Secretary had the duty to consider these criteria in the latter part of Section 1734, and whether he did consider them. If he didn't consider them, was it because his duty was simply a discretionary duty that he could comply with or not as he saw fit?... Now these are the three problems that I want you to carefully indicate the Government's position on.
>
> GOVERNMENT COUNSEL: To answer the Court's last question first, it's our argument that he has discretion in considering—
>
> THE COURT: In considering or not considering.
>
> GOVERNMENT COUNSEL: —or not considering. Now as an alternative argument, assuming he had to consider them we would argue, Your Honor, that—
>
> THE COURT: I'm really asking for the position, not an argument....
>
> GOVERNMENT COUNSEL: I'll attempt to respond to that. Our position, Your Honor,

> would be that these criteria—once the determination is made that actual costs are the same as reasonable costs, that basically excludes all of the other criteria.
>
> THE COURT: I thought that's what you answered.
>
> GOVERNMENT COUNSEL: Because they are really mutually exclusive. If he says, I believe costs are reasonable costs, that means that these other items in no way affect reasonable costs.
>
> THE COURT: I thought that's what you said but I wasn't sure.
>
> GOVERNMENT COUNSEL: Yes, I believe that's the Government's position and we would refer the court to [Secretarial Order No. 3011].
>
> The other point that I would like to make that's unrelated to the Court's inquiry, is that the NEPA process is the necessary and integral part of the application process, and it's totally reasonable that the costs, in complying with the NEPA statute, be paid by the applicant because if is such an integral part of the processing of the application.

January 27, 1981 hearing.

compelling.[10] The idea that Congress legislatively declared costs for EIS's to be reasonable as a matter of law is attractive because it avoids bothersome allocation problems both for the agency and for the court. It obviates the necessity of considering variable elements from project to project. A "trigger" or "but for" mechanism permits the Secretary to ask one simple begging question basing his decision upon its simple begged answer: "But for the right-of-way application which triggered the necessity of costs for 'special studies; environmental impact statements; monitoring construction, operation and termination of any authorized facility [*i. e.,* one authorized by the granting of a right-of-way]; or other special activities' would those costs have been incurred?" The obvious, indeed inescapable, answer is "no"; therefore deposits for all these costs (except management costs) would be required in every instance for every application without reference to any other consideration, standard or limitation.[11]

Such a position would appear plausible on the theory that there has been a legislative determination by the Congress that all of the actual costs for those enumerated documents or activities (*i. e.,* "special studies; environmental impact statements; monitoring construction, operation, maintenance, and termination of any authorized facility; or other special activities") are reasonable as a matter of law for the purpose of being assessed as "reasonable costs with respect to applications," irrespective of "actual costs (exclusive of management overhead), monetary value of the rights or privileges sought by the applicant, the efficiency to the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, the public service provided, and other factors relevant to determining the reasonableness of the costs." If the basic statute reasonably accommodates such a view, it could be said that regulations duly adopted pursuant to rulemaking, within the authorization of the statute would be binding upon the court as a legislative rule even though the statute would permit some other rational interpretation. And in any event it is arguable that the consideration of factors set out in the fourth sentence is indicated through use of the word "may" to be directory and not mandatory.

But however plausible, attractive or compelling the foregoing view may appear on the surface, there are weighty reasons in addition to the legislative history cited which counsel caution in its acceptance too readily.

The "triggered" or "but for" reasonableness as a matter of law may appear justified with reference to a particular project such as the construction of a power facility by a private utility company for profit. But the statute was intended to cover also reimbursement for reasonable costs with respect to applications and other documents relating to private projects of every kind and purpose, whether profitable, profitless,

---

10. When faced with problems of statutory construction, the court should show great deference to the interpretation given the statute by officers or agency charged with its administration. To sustain the application of statutory terms it need not be found that the construction is the only reasonable one, or even that it is the result the court would have reached had the question arisen in the first instance in judicial proceedings. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Unemployment Comm'n v. Aragan,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946). This deference is even more weighty where the administrative agency has been expressly entrusted by Congress with the responsibility of prescribing standards. *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977).

11. This view seems implicit in the agency's decision in this case and is explicit in its recent ruling in *Utah Power and Light Co.,* 52 IBLA 78–133 (Jan. 12, 1981): "While recovery of all costs associated with right-of-way applications including the costs of preparing environmental studies is mandated by FLPMA, the same does not hold true for management overhead which is not recoverable by statute." Again as to the latter point we are confronted by ambivalence on the part of the agency; for if the fourth sentence of § 304(b) does not modify the third sentence, why may not management overhead be recovered in connection with EIS's?

charitable, large, small or dedicated predominantly for public use or benefit.

If the view were taken that to accommodate other types of applications the Secretary by reason of "permissive" wording could allocate in his discretion the costs on the basis of public benefit, the theory of reasonableness as a matter of law would have to be abandoned in favor of an overly vague delegation of legislative authority. Moreover, the regulations issued by the agency, based essentially on a required deposit of actual costs do not permit any such election.

The specification of factors to be considered refers to "reasonable costs under this section" which would suggest application to all of the concepts of "reasonable costs" involved in the section. The Secretary has confirmed the latter interpretation with reference to the exclusion of "management overhead" pursuant to the fourth sentence; if that exclusion is binding upon the Secretary, there seems no reason why other factors mentioned in the fourth sentence must not be considered by the Secretary.

The express provision of the statute that "[i]n determining whether costs are reasonable under this section, the Secretary may take into consideration" the elements specified, plainly indicates that those considerations are relevant to a determination of the extent to which those relating to EIS's are reasonable costs. Any other view seems strained. Since the enumeration of documents and activities in the third sentence includes almost every conceivable cost of any consequence "with respect to applications and other documents relating to such lands," the fourth sentence would be a rather futile and curious provision if it were not intended to relate to the enumeration of activities and documents in the third sentence, including EIS's.

And finally in a broader sense and without reference to these technicalities, the plain meaning of the subsection seems to be that the standard for any inclusion of costs for deposit as therein provided is reasonableness; that EIS's, monitoring and special studies are included among the documents and activities which are to be considered as reasonable costs subject to considerations established in "this section" which should be taken into consideration by the Secretary.

The legislative history in the period prior to the formulation of the fourth sentence, as has been noted, contains statements favoring and opposed to this construction. It was by reason of such a confrontation of views that the language of the fourth sentence was inserted. The most persuasive interpretation of the continuum is that Congress recognized that no hard and fast rule concerning EIS's should be crystallized with reference to every EIS, but the problem should be left for decision in view of the circumstances of each particular case with due consideration of the standards incorporated by Congress to guide and limit that discretion.

The defendants rely upon *Mississippi, supra,* as justifying the allocation of all environmental impact statement costs to Nevada Power. Nevada Power argues that *Mississippi* is inapposite here because it arose under the IOAA rather than the FLPMA under which we are now concerned with specific statutory requirements concerning reasonable costs on the basis of enumerated considerations; in *Mississippi* the NRC had already eliminated substantial public benefit costs whereas in the present case no such determination has been made, and the BLM has taken the position that it need not make that type of preliminary allocation or determination; in *Mississippi* there was no consideration given to the extent of the environmental review whereas in the present case the EIS is the crux of the FLPMA provision and thus justified a thorough consideration; and finally the NRC had already predetermined the costs which were of a special benefit to the applicant and thereafter classified the "environmental review" costs and other costs as merely incidental to the furnishing of the special benefit to the applicant whereas in the present case no such preliminary determination has ever been considered.

It is believed that *Mississippi Power and Light* and the D.C. Circuit cases it relies on

are distinguishable because of the language and context peculiar to the FLPMA. The Independent Offices Appropriation Act provision, 31 U.S.C. § 483a, places the requirement of "fair and equitable" payment by applicants in the direct context of "self sustaining," and "as uniform as practical." The context of the FLPMA section significantly differs. The considerations in the IOAA are "direct and indirect costs to the Government, value to recipient, public policy or interest served, and other pertinent facts," with no suggestion of allocation, in contrast, *inter alia*, to the considerations listed in the FLPMA which includes "that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant." To the extent that case may not be distinguishable, it is my opinion that its mechanical "trigger" or "but for" theory should not be accepted as controlling here.

The plain meaning of section 304(b) is opposed to any such absolutist view. The administrative rule to the contrary must yield to the statute. The model on which the original Senate version was in part based initially, the Mineral Leasing Act of 1920, as amended by the Act of Nov. 16, 1973 (the Trans-Alaska Pipeline Authorization Act), was advisedly departed from by a rejection of any unqualified reimbursement theory for the idea that reasonable costs only could be recovered, coupled with the concept that costs of environmental impact statements, even though otherwise classifiable as "extraordinary," could be considered for permits or rights-of-way, provided the Secretary in assessing them gave due consideration to guidelines which Congress established. This is believed to be the true meaning of the section in question.

It seems to me, in other words that Congress departed from the unqualified mandate of Section 28(*l*) of the Mineral Leasing Act of 1920, as amended,[12] as well as from the language of the Independent Offices Appropriation Act by the unification of the reasonable cost concept relating to EIS's with guidelines for determining "reasonable costs" under this section, and that the variety and breadth of projects intended to be covered by section 304(b), as contrasted with the narrower compass of the Mineral Leasing Act, render it clear that a different meaning was intended with reference to environmental impact statements and other activities involved in the granting of rights-of-way applications under the FLPMA. Such difference is confirmed by by the legislative history of section 304(b). It is clear that for the very purpose of avoiding an automatic trigger approach upon which the conferees could not agree and as to which it was apprehended Congress could not, language and its context peculiar to the FLPMA was approved by the Conference Committee and enacted by Congress.

No rule of deference to the administrative interpretation precludes the court from requiring the agency to give heed in its regulations and decisions to statutory requirements.

Here, the Secretary was not charged by Congress with the responsibility of establishing standards of reasonableness, as in *Batterton v. Francis, supra.* On the contrary, Congress itself specified standards in section 304(b) of the FLPMA applicable "[i]n determining whether costs are reasonable under this section," which the agency has largely disregarded. The FLPMA charges the Secretary with promulgating regulations only "to carry out the purposes of this Act and other laws applicable to the public lands." (Section 310.)

12. (*l*) The applicant for a right-of-way or permit shall reimburse the United States for administrative and other costs incurred in processing the application, and the holder of a right-of-way shall reimburse the United States for the costs incurred in monitoring the construction, operation, maintenance and termination of any pipeline and related facilities on such right-of-way or permit area....

Senate Report (Interior and Insular Affairs Committee) No. 93–207, June 12, 1973, U.S. Code Cong. & Admin.News 1973, p. 2417, 2527, concerning this legislation stated among other things: "Section 28(*l*) requires reimbursement of costs incurred in processing an application. These costs include the cost of preparing an environmental impact statement."

In *Gray Panthers v. Administrator, Health Care Fin.*, 629 F.2d 180, 183–84 (D.C. Cir.1980), the court in striking down regulations and remanding, even though the agency had been expressly authorized to "determine the standards" involved, stated that in the face of such authority the court is not relieved of "its duty to conduct a searching inquiry," and that in reviewing the promulgation of regulations, "the court 'must consider whether the decision was based on a consideration of the relevant factors.'" (Citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).)

In *Moore v. Harris*, 623 F.2d 908, 918–19 (4th Cir. 1980), the court noted that even though Congress delegated authority "'to issue such regulations as [he] deems appropriate to carry out the provisions of the [Act],'" such a delegation "does not free courts from their responsibilities to say what the law is and to determine whether the regulation in question is consistent with the law."

When the question is one requiring expertise in a particular subject area, deference is more clearly summoned, as where the dispute is over whether the agency's policy satisfactorily fulfills the statutory aims; but where the question is what those purposes are, "the courts are the specialists, whether analysis of legislative history is called for, or whether the main process is finding the meaning of words." K. Davis, Administrative Law Treatise § 30.09, at 243 (1958).

 A rule of deference does not apply when an agency has misinterpreted its statutory mandate. *Association of Am. Railroads v. Costle*, 562 F.2d 1310, 1318–19 (D.C. Cir.1977). A court should not abdicate its ultimate responsibility to construe the language employed by Congress but rather should defer to an administrative construction only if there are no compelling indications that it is wrong; if so it has a duty to ignore a construction should it determine that the construction is in conflict with the plain intent of the Congress. *Wilderness Society v. Morton*, 479 F.2d 842, 864–866

(D.C.Cir.) (*en banc*), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

I hold that the provisions in the fourth sentence of the section do modify the earlier provisions that reasonable costs include the costs of an environmental impact statement, although certainly in view of *Alumet* it does not excise the former provisions from the statute. The view of modification beyond mere permissiveness is bolstered, I believe, by additional language in *Alumet* with reference to *National Cable* and *New England Power, supra*:

> We shall assume that Congress was aware of its limitations in delegating its authority to "tax." The language of § 1734(b) reflects that understanding in that Congress expressed that the Secretary should consider the benefit to the general public in its attempted recoupment of costs of an EIS.

607 F.2d at 916.

The word "may" as used in the fourth sentence of section 304(b) should be interpreted as mandatory rather than as merely permissive in providing bases for the exercise of the Secretary's discretion. Such an interpretation depends upon the background circumstances and context in which the words are used and the legislative intent. *United States v. Reeb*, 433 F.2d 381 (9th Cir. 1970). *See also United States v. Thoman*, 156 U.S. 353, 15 S.Ct. 378, 39 L.Ed. 450 (1895); *Com. of Mass. v. Andrus*, 594 F.2d 872 (1st Cir. 1979). It is my opinion that there are involved in section 304(b) more than merely permissive standards.

 The Reimbursement Regulations and Order of the Secretary are insufficient as being inconsistent with the FLPMA mandate of reasonableness in that they do not take into consideration, nor do they permit consideration by the Secretary of, factors required to be considered in the determination of reasonable costs. Irrespective of the view that may be taken of the word "may" as permissive or mandatory, the regulation and order do not pass muster because they preclude rather than permit the Secretary's consideration of the

factors specified in section 304(b) other than "actual costs."

Defendants' comments concerning the regulations promulgated on July 1, 1980, published at 45 Fed.Reg. 44518, 44532–33, are illuminating. They say that "to the extent that the revised regulations carried forward the existing regulations, they also carried forward the consideration given to the factors addressed by the existing regulations" and that in addition, "separate consideration was given to the 'actual cost' factor." They add:

> In promulgating the right-of-way cost recovery rules, the Secretary exercised his discretion to define, in the regulations, "reasonable costs" to be reimbursed by an applicant for a right-of-way over public lands. The regulations render unnecessary the further consideration of these factors by BLM in connection with each right-of-way application.

This would be an easy out for the Secretary, but fails because of the lack of any showing in the record that in such pervasive and all-encompassing consideration the factors enumerated in 304(b) were weighed at all. The regulations and order negate any such weighing process, and FLPMA neither contemplates nor permits a generalized advance determination to control findings that could only be valid upon a consideration of particular projects, particular "applications," particular "special studies," particular "environmental impact statements," and other particular "special activities." Unless the determination of the reasonableness of the costs takes place in the context of a particular project, the Secretary cannot even generally appraise the monetary value of the rights or privileges sought by the applicant, the efficiency of the government processing involved, that portion of the cost incurred for the benefit of the general public interest rather than for the exclusive benefit of the applicant, or the public service provided.

Furthermore, the bases of the determination must be reasonably articulated so as to permit any reviewing court to know at least in a general way both that consideration was given to the relevant factors and that the consideration was sufficiently meaningful to commend deference by the court. *See Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1974); *National Lime Ass'n v. E. P. A.,* 627 F.2d 416, 451–53 (D.C.Cir.1980); *Citizens Ass'n of Georgetown, Inc. v. Zoning Com'n of D. C.,* 477 F.2d 402 (D.C.Cir.1973); *Greater Boston Television Corporation v. F. C. C.,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). As said in *National Cable, supra,* 415 U.S. 336, 343, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370, after the lack of specificity in the Commission's justification of its action was noted, "we cannot be sure that the Commission used the correct standard in setting the fee." 415 U.S. at 343, 94 S.Ct. at 1150. In the companion case, the Court explicitly recognized the need for specificity in assessing the charges, stating that the IOAA permits "only specific charges for specific services to specific individuals or companies." *FPC v. New England Power Co., supra,* 415 U.S. at 349, 94 S.Ct. at 1154.

It is recognized that a departure from the agency's "trigger" or "but for" formula will involve additional problems of investigation, accounting, articulation, weighing, judgment and perhaps allocation on the part of the agency. As Judge MacKinnon said, with reference to different statutes and with different reasons for remand to the agency, "[w]e are very cognizant of the extreme difficulty of this task—which resembles unscrambling eggs—but, as we interpret the law, it is necessary in order to bring the agency into compliance with the statute and the Supreme Court decisions." *Electronic Industries Ass'n, Etc. v. F. C. C.,* 554 F.2d 1109, 1117 (D.C.Cir.1976). This is not to say as to the latter problem that the required reimbursement of EIS costs in the present case without allocation would necessarily violate standards established in *Cable Television,* but in various other cases depending upon their particular circumstances it would. Both with respect to the circumstances of this and all other applications, Congress has required the Secretary

to assess the reasonableness of cost deposits in view of specified considerations. This he has not done; this he must do.

The determination of reasonable cost of applications has been entrusted to the Secretary subject to guidelines established by Congress, including consideration of the factors mentioned in the fourth sentence of section 304(b). Nevada Power has asked this court to determine that a substantial portion of the costs of the EIS in question here cannot be assessed against it and to order refund of any excessive charges.[13] It would be unjustifiably usurpative for this court to assume to make such determinations on the record before it.

The Secretary should be required to reconsider his decision on the basis of the proper standards, to develop whatever record is reasonably necessary upon which to so base it, and to reasonably articulate the same so that the court can determine whether or to what extent his reconsidered action is in accordance with statutory requirements or guidelines, arbitrary or capricious or otherwise insupportable. *Labor Board v. Metropolitan Ins. Co.,* 380 U.S. 438, 442–44, 85 S.Ct. 1061, 1063–64, 13 L.Ed.2d 951 (1965); *City Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank,* 600 F.2d 681 (7th Cir. 1979). *See F. P. C. v. Idaho Power Co.,* 344 U.S. 17, 20, 73 S.Ct. 85, 86, 97 L.Ed. 15 (1952); *N. L. R. B. v. Food Store Employees,* 417 U.S. 1, 8–9, 94 S.Ct. 2074, 2079–2080, 40 L.Ed.2d 612 (1974); *Prince Mfg. Co. v. United States,* 437 F.Supp. 1041 (N.D. Ill.1977). As much as the parties and the court might otherwise desire to decisively conclude the assessment of costs at this point, the case must be remanded to permit the Secretary to apply and articulate the proper legal standards. *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *F. T. C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 249, 92 S.Ct. 898, 907, 31 L.Ed.2d 170 (1972).

*Relief and Conclusions:*

The relief to be granted herein by declaratory judgment should recognize (1) the limitations and considerations which Congress laid down for the determination of reimbursable costs; (2) the responsibility of the Secretary in the first instance to make a determination as guided by these limitations and responsibilities and to make sufficient investigation, record and articulation of reasons to render feasible a meaningful judicial review of his determinations; (3) the lack of authority on the part of the court in the first instance to exercise the discretion of the Secretary even though he heretofore failed to exercise that discretion in the manner mandated by Congress but subject to the court's proper review of his exercise of discretion and its making of appropriate orders upon a sufficient record; and (4) the lack of jurisdiction on the part of the court to grant monetary relief authorized only through the Court of Claims. 28 U.S.C. §§ 1346(a)(2), 1491.

It is therefore hereby concluded that:

1. The motion of the Secretary for summary judgment should be denied.

2. The motion of Nevada Power for summary judgment should be granted in harmony with this memorandum opinion.

3. The case should be remanded to the Secretary for further proceedings consistent with this opinion.

4. The judgment should make reasonable and lawful provision for costs.

---

**13.** It is unclear in view of statements appearing in its brief whether Nevada Power's position really goes beyond the contention that the agency should be held to the requirement of consideration of relevant factors and a recognition in view of them that it was error for the Secretary to ignore the element of public benefit in determining reasonable costs to be reimbursed.

In our own case, we are simply urging not that none of the EIS costs can be assessed, but that the regulations are invalid and inapplicable under the FLPMA because they make no provision for the consideration of the public benefit factor which is prescribed by FLPMA, section 304(b). When, as is readily apparent the environmental impact statement, both as a matter of law and as a matter of fact under its actual provisions, encompasses public benefit, it is error as a matter of law to hold that none of such costs relate to public benefit and that, therefor, the public benefit may be ignored by the Secretary in determining reasonable costs to be reimbursed.

5. Since the question of relief is a problem on which counsel have not yet been heard, the court should afford them opportunity for discussion with the court as to the form of judgment that should be entered in harmony with this opinion, including the detail of directions upon remand.

The court accordingly directs counsel for the plaintiff within ten days from date of this memorandum decision to propose a form of summary judgment. Counsel for the defendants are allowed ten days thereafter, should they not be able to agree with plaintiff's counsel as to form of judgment, within which to submit their proposed form in harmony with this memorandum decision, it being understood that any such agreement or submissions will be without prejudice to, or waiver of, the substantive contentions of the respective parties.